**UNITED STATES of America, Appellee,**

v.

**Costas PAVLOYIANIS, Defendant–Appellant.**

**No. 1207, Docket 92–1776.**

United States Court of Appeals,
Second Circuit.

Argued March 11, 1993.

Decided June 30, 1993.

Mark M. Baker, New York City (Barry I. Slotnick, Michael Shapiro, Slotnick and Baker, of counsel), for defendant-appellant.

Bruce G. Ohr, Asst. U.S. Atty., S.D.N.Y. (Roger S. Hayes, U.S. Atty., Andrew C. McCarthy, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before: NEWMAN and CARDAMONE, Circuit Judges, and METZNER, District Judge.*

* Hon. Charles M. Metzner, Senior United States District Court Judge for the Southern District of New York, sitting by designation.

CARDAMONE, Circuit Judge:

 The question on this appeal is whether the discovery after a defendant's trial that a government witness perjured herself bars his retrial on double jeopardy grounds. The issue for us is a subtle one: whether the government's conduct in connection with its witness' perjury was merely a legal error or amounted to an impropriety or injustice against the defendant. While any impropriety in a defendant's case disserves the fair administration of criminal justice, such behavior, standing alone, will not suffice to invoke protection from prosecution on double jeopardy grounds. To claim that constitutional bulwark the misconduct must have been undertaken with the deliberate purpose of depriving the defendant of double jeopardy's shield, that is to say, only a high-handed wrong intentionally directed against defendant's constitutional right will trigger his right not to be twice put in jeopardy for the same offense.

Costas Pavloyianis was found guilty of conspiring to distribute heroin in January 1992 by a jury in the United States District Court for the Southern District of New York before Judge John F. Keenan. After his conviction the prosecutor revealed that during the course of the trial one of its key witnesses had committed perjury. Eventually the government consented to a new trial. Whereupon Pavloyianis moved to dismiss the heroin conspiracy charge on the grounds that retrying him on the same charge would violate the Double Jeopardy Clause of the Fifth Amendment. The district court denied this motion and Pavloyianis' request that an evidentiary hearing be held on alleged government misconduct. We turn now to the facts.

## BACKGROUND

### A. The Alleged Drug Transaction

Because the facts are important we set them forth in some detail. In the course of an investigation of the Kaperonis drug organization, on March 27, 1991 agents of the Westchester Drug Enforcement Task Force (Task Force) discovered heroin on a Greek container ship docked in Port Elizabeth, New Jersey. Inquiries about the heroin led the agents to one Blanca Moreno who, in exchange for leniency, agreed to assist Task Force investigators' efforts to penetrate the Kaperonis organization. Moreno took the agents to an apartment in which 4.2 kilograms of heroin allegedly belonging to that group were found. On April 11, 1991 Moreno tape-recorded her phone call with James Kaperonis. He instructed her to bring the 4.2 kilos of heroin to a McDonald's restaurant on Fordham Road in the Bronx, where she would be met by a man identifying himself as "Mike" and holding two roses. Moreno was told to give the drugs to "Mike" in exchange for $4,000 in cash.

Later that same day, Moreno and an undercover Task Force Agent, Arturo Claudio, drove to the Fordham Road McDonald's, parked and waited. Some time later Pavloyianis drove into the restaurant's parking lot and, according to Agent Claudio, sat in his automobile for awhile, then drove down Fordham Road and parked at a Mobil gas station visible from McDonald's. While there he held up two flowers. Moreno and Claudio then walked over to Pavloyianis' auto, where he identified himself as "Mike," asked about the "merchandise," and indicated he had the cash with him.

Agent Claudio suggested they return to McDonald's to transact their business, but Pavloyianis declined because he feared police were in the vicinity. The agent then recommended they drive to a nearby White Castle restaurant and make the exchange there. Pavloyianis agreed. The Task Force agent and Moreno returned to their automobile and drove it along Fordham Road toward the White Castle restaurant. Pavloyianis followed them in his own vehicle. When the agent made a left turn, Pavloyianis continued driving straight ahead along Fordham Road. Other Task Force agents immediately pursued and arrested him.

When he was arrested Pavloyianis was carrying an envelope with $4,000 in cash, a loaded .38 caliber revolver, a briefcase containing various papers, and two peach-colored artificial flowers. After being given his *Miranda* warnings, defendant told the agents that he was in financial trouble and that Kaperonis offered to lend him some

money in return for his help in picking up a package. He said he had no idea what was in the package and had not been told. On July 10, 1991 he was indicted by a federal grand jury in the Southern District charged with one count of conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841 & 846 (1988).

### B. *The Two Trials*

On December 10, 1991 defendant's first trial commenced before Judge Keenan and a jury. In the course of the trial, a Task Force agent testified regarding certain post-arrest statements made by Pavloyianis which, upon objection, the government conceded had not been previously revealed to the defendant as required by Fed.R.Crim.P. 16(a). The trial judge thereupon declared a mistrial. When defendant made a motion to dismiss the indictment on the grounds of double jeopardy, the district judge denied it.

A month later a second trial began before the same judge and a different jury. The government called Blanca Moreno to testify. She gave a detailed description of the recited events of April 11, 1991 along Fordham Road and identified Pavloyianis as "Mike" in that aborted deal. Moreno also recounted her telephone conversation with Kaperonis that set up the meeting, filling in and explaining gaps that appeared in the tape recording of the call. She stated, in addition, that she had been introduced to James Kaperonis in the early 1980s by her employer, also named "Jim." She explained that she had assisted Jim in his drug dealings with Kaperonis until Jim's arrest in 1987.

From that point on, she declared, she ceased to have anything to do with the heroin trade, but did acknowledge remaining in contact with Kaperonis. He gave her financial assistance—admittedly $30,000 over several years—in exchange for information about whether "anyone had come around asking about" either him or Jim. Moreno testified she resumed drug dealing activities on behalf of Kaperonis in January 1991, several months before her arrest by Task Force agents.

The government presented other witnesses who gave further testimony about the Ford-ham Road transaction. It introduced evidence establishing that Pavloyianis lived in the apartment complex where Kaperonis had initially instructed Moreno to drop off the heroin on April 9, 1991. Expert testimony was introduced to show that papers found in Kaperonis' briefcase bore notations consistent with drug dealing operations.

As part of his defense, Pavloyianis produced evidence that he was the owner and operator of an ostensibly famous Greek nightclub and was behind in his income taxes. He also presented proof purporting to show that the papers in his attache case related to audio and electronics equipment used in his nightclub. Defendant offered proof of his good character and established that he had no prior history of involvement with drug trafficking. The jury nonetheless convicted him of the heroin distribution conspiracy on January 16, 1992.

### C. *Moreno's Perjury*

A month earlier—on December 16, 1991—Guillermo Gil, a Department of Justice attorney in Puerto Rico, learned from one Gloria Vega–Sanchez that she had engaged in various drug dealings with an individual named "Jim" in New York. Vega–Sanchez told the government attorney that she had been introduced to Jim by a childhood friend—whom she declined to identify—who was having trouble with the law. Gil investigated and found that Vega–Sanchez's friend was Blanca Moreno. According to the government, Gil informed the prosecutor in Pavloyianis' case of this connection on January 7, 1992—one day before defendant's second trial began.

The prosecutor avers that before Moreno testified on the morning of January 8 he questioned her about her role in the Puerto Rican heroin trade. Moreno admitted making telephone calls to Puerto Rico and picking up cash there on behalf of her boss Jim, but she denied personally transporting drugs to or from the island. The government did not think these admissions contradicted Moreno's earlier statements regarding her involvement in the drug trade. As a result, the prosecutor decided that no further disclo-

sures to the defense with respect to this witness were warranted. The government now acknowledges in its appeal brief that the tardiness of Moreno's new admissions should have been disclosed to the defendant, if not under the standard of *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), then under the practice and policy of the United States Attorney's Office for the Southern District of New York.

On January 17, 1992 the day after the jury returned a guilty verdict against defendant, attorney Gil again contacted the prosecutor with further information that—contrary to her prior admissions—Moreno personally had carried drugs between New York and Puerto Rico on numerous occasions. Then, on January 22, 1992, Gil learned from Vega–Sanchez that Moreno not only had been a frequent drug courier but also took over the reins of the entire Kaperonis Puerto Rican drug operation after Jim's arrest in 1987. Gil revealed this new disclosure to the prosecutor in defendant's case on January 24.

On January 30, 1992 Guillermo Gil and that prosecutor met with Blanca Moreno and her attorney. Moreno confessed the full extent of her involvement in the heroin trade. She acknowledged that Vega–Sanchez's allegations were essentially correct and revealed that she dealt directly with James Kaperonis after Jim's arrest in 1987. Moreno admitted that from 1987 to 1990 she received regular shipments of drugs from Greece, which she then transported to Puerto Rico.

### D. *Post–Trial Motions*

1. *Motion for a New Trial.* On May 4, 1992 three months after discovering that Moreno had not testified truthfully, the government informed the district court and the defendant of her perjury. Pavloyianis thereafter moved for a new trial pursuant to Fed. R.Crim.P. 33, arguing that Moreno's testimony had been critical to the prosecution and that had the jury been aware of Moreno's perjury it would not have convicted him.

In an opinion and order dated August 25, 1992, the district court denied the motion for a new trial. It ruled that absent a showing of prosecutorial misconduct, a new trial is warranted only where the newly discovered evidence is extraordinary. The trial court found the evidence of Moreno's perjury fell short of this standard and concluded instead it would be "hard-pressed" to find this new evidence would have changed the jury's guilty verdict.

The district court did order a hearing to look into the question of possible government misconduct. It noted that what the prosecutor knew or should have known about Moreno's veracity at trial was not revealed in the prosecutor's affidavit, nor was there any satisfactory explanation for the more than three-month delay in disclosing Moreno's perjury. The ordered hearing was scheduled for October 2, 1992. On the eve of the hearing, the government consented to Pavloyianis' request for a new trial, stating in a letter addressed to the district court that then-United States Attorney Otto Obermaier had personally interceded and determined that the equities of the situation merited retrial of the case, regardless of whether such trial was required as a matter of law. The district court accepted the prosecutor's concession, criticized the government for its tardy decision to consent, and ordered that Pavloyianis—who had been incarcerated for nearly nine months since January 16, 1992, the time of the jury's guilty verdict—be released on bail.

2. *Motion to Dismiss the Indictment.* Following the government's consent to a new trial, Pavloyianis moved once more to dismiss the charge against him on double jeopardy grounds and pursuant to the district court's supervisory powers. In an order dated December 21, 1992, the district court denied the defendant's motion in all respects. The trial court ruled that despite the defendant's argument that the government withheld Moreno's perjury because it anticipated an acquittal, there was no indication of such anticipation, and that there was ample evidence to convict, even had the jury been aware of Moreno's perjury on the collateral issue of her Puerto Rican drug involvement. It continued: "Dismissal of the indictment under the Court's supervisory role is simply too drastic a remedy in this instance . . ., and an evidentiary hearing at this stage would serve no purpose."

Pavloyianis brings the instant appeal asserting that the district court's order denying his double jeopardy claim should be reversed or, in the alternative, that the case should be remanded to the district court for an evidentiary hearing regarding the prosecutor's subjective intent. We affirm.

## DISCUSSION

### A. Double Jeopardy Concepts

■ We note initially that we have jurisdiction to hear this interlocutory appeal pursuant to 28 U.S.C. § 1291 (1988) because appeals may be taken prior to final judgment under the Speech and Debate Clause or on a motion to reduce bail, see United States v. Helmsley, 864 F.2d 266, 268 (2d Cir.1988), cert. denied, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989), or where, as here, a double jeopardy claim is made. See Abney v. United States, 431 U.S. 651, 663, 97 S.Ct. 2034, 2042, 52 L.Ed.2d 651 (1977).

Although not unknown before the development of the English common law, the concept of double jeopardy is not a universal one. It clearly capsulizes the widely-held belief that no person should be made to suffer twice for the same act. See Jay A. Sigler, Double Jeopardy: The Development of a Legal and Social Policy 35 (1969). The Constitution adopts this common law belief when it provides that no person shall be twice put in jeopardy for the same offense.

■ Analysis of double jeopardy begins with the language of the Fifth Amendment and the rights it aims to safeguard. The Fifth Amendment states: "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. v. One of the rights a defendant ordinarily has under this provision is to have his trial completed in and by the particular tribunal where he is presently on trial, except where in the trial court's discretion, the right must give way to the public interest in having "fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

■ The trial court's discretion in this area is broad. If for reasons it deems compelling, it believes substantial justice may not be attained without aborting the trial, the trial judge may—consistent with the Fifth Amendment—declare a mistrial and order the defendant retried, even though the defendant did not seek or consent to the mistrial and, in fact, objected to it. See Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961). Barring defendant's retrial on double jeopardy grounds is particularly inappropriate, the Court believed, where the trial court granted the mistrial "in the sole interest of the defendant." Id. at 369, 81 S.Ct. at 1526.

Ten years later, United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (plurality opinion of Harlan, J.) cast doubt on Gori s concept of considering in whose interest a mistrial is declared. Terming such a post hoc assessment by an appellate court "an exercise in pure speculation," the opinion stated that this approach does not meet the policies the Fifth Amendment was designed to serve. See id. 400 U.S. at 483, 91 S.Ct. at 556. It went on to observe that prosecutorial or judicial overreaching are among the policies that double jeopardy protects against, together with maintaining a defendant's right to have his ongoing trial completed before a particular court. See id. at 484, 91 S.Ct. at 556. Jorn posited therefore that when a defendant moves for a mistrial, he sacrifices the right to have a particular tribunal pass judgment, even when that motion is occasioned by judicial or prosecutorial error. Hence, in such circumstance a defendant may be reprosecuted before a different judge and/or jury and such reprosecution is consistent with Fifth Amendment safeguards. Id. at 485, 91 S.Ct. at 557.

Earlier cases had held that where defendant's motion is brought about by judicial or prosecutorial impropriety—as distinct from error—designed to avoid an acquittal, reprosecution may be barred. Id. at 485 n. 12, 91 S.Ct. at 557 n. 12. And, that when a trial court grants a mistrial, absent a motion by defendant, the doctrine of manifest necessity requires that before taking such action, the court exercise the most scrupulous discretion. See United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824) (Story,

J.). In *Jorn* that was not done. Thus, reprosecution of defendant was barred by the Fifth Amendment. *Jorn,* 400 U.S. at 487, 91 S.Ct. at 558.

■ The key double jeopardy policy aimed to be protected where there has been prosecutorial or judicial error is to retain for the defendant primary control over whether he wants to continue on trial where he is, thereby avoiding the expense and anxiety of a lengthy appeal and possible retrial, or whether he wants to end that trial in light of the taint in the proceedings. *See United States v. Dinitz,* 424 U.S. 600, 608–09, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). The crucial question therefore was whether the prosecutorial misconduct was engaged in for the purpose of "goading" defendant into moving for a mistrial or prejudicing his possibility of obtaining an acquittal. *Id.* at 611, 96 S.Ct. at 1081. If so found, such prosecutorial impropriety violated the Double Jeopardy Clause.

In *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court carefully circumscribed the *Dinitz* rule controlling the effect of a defendant-initiated mistrial on a claim of double jeopardy. Kennedy, the defendant in a state court criminal case, moved for and received a mistrial because of improper prosecutorial questioning of an expert witness. When the state attempted to retry him, the defendant made a motion to dismiss the charges on double jeopardy grounds. The Oregon Court of Appeals granted Kennedy's motion because of what it characterized as prosecutorial "overreaching" during the trial. *See id.* 456 U.S. at 670, 102 S.Ct. at 2085. The Supreme Court reversed, declaring that prosecutorial misconduct or harassment adequate to warrant a mistrial was not by itself sufficient to raise the bar of double jeopardy. *Id.* at 675–76, 102 S.Ct. at 2089.

■ The Supreme Court instead adopted a rule providing that a defendant who has moved for and been granted a mistrial may successfully invoke the Double Jeopardy Clause to prevent a second prosecution only when the prosecutor's conduct giving rise to the mistrial was intended to "goad" or provoke him into moving for the mistrial. *Id.* at 673, 679, 102 S.Ct. at 2088, 2091. Under this standard, the question on which decision hinges is whether prosecutorial misconduct was undertaken with the specific intent "to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 676, 102 S.Ct. at 2089; *accord United States v. Huang,* 960 F.2d 1128, 1133 (2d Cir.1992).

■ Hence, as a broadly stated rule, the Double Jeopardy safeguard does not prevent retrial of a defendant who obtains a reversal of his conviction because of an error or defect in the criminal proceedings leading to conviction. *See United States v. Ball,* 163 U.S. 662, 672, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). Nor, as noted, is it ordinarily a bar to retrial if the defendant's original trial was not completed because he obtained or consented to a mistrial. *See Jorn,* 400 U.S. at 485, 91 S.Ct. at 557; *Huang,* 960 F.2d at 1133. However, it may be seen that the Double Jeopardy Clause protects a criminal defendant from multiple successive prosecutions for the same offense that arise from prosecutorial overreaching engaged in with the deliberate intent of depriving him of having his trial completed by a particular tribunal or prejudicing the possibility of an acquittal that the prosecutor believed likely. *See Kennedy,* 456 U.S. at 675–76, 102 S.Ct. at 2089.

In *United States v. Wallach (Wallach II),* 979 F.2d 912, 915–17 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993), we wrestled with how the teaching of *Kennedy* might be applied outside the mistrial context. There it was found that the government's principal witness had not testified truthfully in response to collateral questions regarding his gambling. The government asserted it became aware of the witness' perjury only after the completion of the trial that resulted in the defendants' convictions. When the government revealed the perjury to defense counsel, he immediately moved for a new trial. The district court denied the motion. We reversed because we believed the prosecutor should have known that the witness was not telling the truth. *United States v. Wallach (Wallach I),* 935 F.2d 445, 457 (2d Cir.1991). When the government then attempted to retry Wallach, he

moved to dismiss the indictment on double jeopardy grounds, citing *Kennedy*. The government protested that *Kennedy*'s applicability was confined to that case's particular circumstances, that is, a trial ending with the granting of defendant's mistrial motion. *See Wallach II*, 979 F.2d at 915.

Although expressing reservation about whether the carefully worded statement of the rule in *Kennedy* could be expanded beyond the mistrial arena, we thought there was some force to the argument for a limited extension.

> Since *Kennedy* bars a retrial on jeopardy grounds where the prosecutor engages in misconduct for the purpose of goading the defendant into making a successful mistrial motion that denies the defendant the opportunity to win an acquittal, the Supreme Court might think that the Double Jeopardy Clause protects a defendant from retrial in some other circumstances where prosecutorial misconduct is undertaken with the intention of denying the defendant an opportunity to win an acquittal.

*Id.*, 979 F.2d at 915–16. Accordingly, we continued, if an extension of *Kennedy* beyond the circumstances of a mistrial were warranted, it would be to bar "retrial only where the misconduct of the prosecutor is undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct." *Id.*

We went on to hold that applying this circumscribed extension of *Kennedy* yielded Wallach nothing because the prosecutor's handling of the perjurious witness revealed neither deliberate misconduct nor an intent to avoid an acquittal that was apprehended as being likely. Nor was there any evidence that the prosecution had knowledge of the perjury. *See id.*, 979 F.2d at 916–17.

### B. *Concepts Applied to the Present Case*

We turn to the present case, examining its procedural posture and factual circumstances in light of the law of double jeopardy just outlined. The same rationale that decided *Wallach II* governs the present case. Any expansion of *Kennedy* along the lines suggested by *Wallach II* avails Pavloyianis no double jeopardy protection from retrial.

To begin, it is not clear the prosecution engaged in deliberate misconduct *during* Pavloyianis' second trial, which is the relevant period of inquiry. *Cf. Wallach II*, 979 F.2d at 917. Pavloyianis insists the prosecutor purposely concealed information regarding Blanca Moreno's criminal activity that was contrary to her trial testimony. The facts are more equivocal. On the eve of Moreno's testimony, the prosecutor learned from government attorney Gil that Moreno was involved with her employer "Jim" in heroin trafficking in Puerto Rico. The prosecutor questioned Moreno regarding this new information and elicited a general admission from her before the jury that she had arranged the importation and distribution of heroin during much of the 1980s. The prosecutor had no actual information indicating that Moreno was not telling the truth to him or to the jury. Rather, Gil's disclosure revealed only that Moreno had not divulged a specific instance of illicit conduct, the general nature of which she already had admitted. The full extent of Moreno's Puerto Rican drug activities and her perjury became known only after Pavloyianis' conviction.

Nevertheless, even accepting Pavloyianis' argument that the prosecution's actions constituted deliberate misconduct, there is simply no evidence that this misconduct was perpetrated with the specific objective of avoiding an acquittal that the prosecutor viewed as likely. The evidence against Pavloyianis was strong enough so that the government had every reason to anticipate a conviction, even had Moreno's perjury about matters collateral to Pavloyianis' guilt been fully disclosed. Her testimony had been corroborated by significant independent evidence, including the testimony of Task Force Agent Claudio, who was with Moreno throughout her dealings with Pavloyianis in the Bronx on April 11. Again, the flowers and *loaded* gun identified the defendant as the drug courier whose appearance had been expected as a result of Kaperonis' recorded phone conversation with Moreno. Further, experts testified that the papers found in his

briefcase suggested Pavloyianis' involvement in the drug trade. Disclosure to the jury of Moreno's perjury on the collateral point of the precise extent of her Puerto Rican drug activities may have weakened the government's case to some degree because of its impact on her credibility. But, as the district court noted in denying the defendant's jeopardy motion, there was still more than enough evidence to support a conviction.

We thus see nothing in this record to suggest that the prosecutor engaged in misconduct with the intention of avoiding what he viewed as a likely acquittal. While the facts imply that the government's counsel may have been guilty of "a certain tunnel vision" in his handling of Blanca Moreno, *United States v. GAF Corp.*, 884 F.2d 670, 674 (2d Cir.1989), there is no indication he engaged in the type of conduct required to invoke the double jeopardy bar to retrial. As in *Wallach II*, this case lacks the factual predicate—misconduct deliberately engaged in to prejudice the possibility of defendant's acquittal, which the prosecutor thought likely—for the extension of the *Kennedy* rule outside the mistrial context.

 Pavloyianis next contends that an evidentiary hearing is required for this determination of prosecutorial intent, and he claims that the district court was simply wrong as a matter of law in not permitting him to proceed with such a hearing. We disagree. No rule of law requires a hearing in this sort of case where the relevant facts can be ascertained from the record. *Cf. Wallach II*, 979 F.2d at 914–17 (no hearing mandated). The district court that presided over all the proceedings and that reviewed affidavits, which it ordered the government to submit, concluded that there was "not the slightest indication or evidence that the trial prosecutor anticipated an acquittal." Only where the prosecutor's misconduct was deliberate and the anticipation of acquittal was likely, all as found in the objective facts, does double jeopardy bar retrial. Our review of the record satisfies us that the district court's contrary finding was not clearly erroneous and should not therefore be disturbed.

Last, and certainly not least, we deem it important to emphasize that our decision in the instant case is not to be misread as an endorsement of the prosecutor's actions during its conduct of this case. Repeated instances of government ineptitude—albeit not rising to the level of malevolence—have transformed a relatively simple narcotics case into a matter ricocheting around the federal courts for over two years, one that will now require a third jury trial. The two multi-month delays, one in acknowledging Blanca Moreno's perjury and the other in finally consenting to a new trial, are both inexplicable and intolerable. Like the district court, we are troubled by the manner in which this matter has been handled by the government's attorneys, to whom we normally ascribe a higher standard of professional and ethical responsibility. Nevertheless, our disapproval of the prosecution's actions does not here warrant the dismissal of this defendant's indictment under the Double Jeopardy Clause of the Fifth Amendment.

### CONCLUSION

The order of the district court denying defendant's motion to dismiss and for a hearing accordingly is affirmed.