**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellant,*

          v.

CHARLY SION HAGEGE,
              *Defendant-Appellee.*

No. 04-50425

D.C. No.
CR-03-00965-FMC

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

          v.

CHARLY SION HAGEGE,
              *Defendant-Appellant.*

No. 04-50427

D.C. No.
CR-03-00965-FMC

OPINION

Appeal from the United States District Court
for the Central District of California
Florence Marie Cooper, District Judge, Presiding

Argued and Submitted
December 6, 2005—Pasadena, California

Filed February 22, 2006

Before: Harry Pregerson, Robert E. Cowen,* and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Cowen

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

1827

## COUNSEL

Elana Shavit Artson, Assistant United States Attorney, Los Angeles, for the plaintiff/appellant/appellee.

Stanley L. Friedman, Esq., Los Angeles, for the defendant/appellee/appellant.

## OPINION

COWEN, Circuit Judge:

The United States appeals the district court's sentence of Charly Sion Hagege for bankruptcy fraud and false represen-

tation of a social security number. The government argues that the district court committed error in refusing to increase Hagege's sentence on the basis of judicially-found facts. Hagege cross-appeals his conviction based on the following grounds: (1) the district court erred in denying Hagege's motion for an evidentiary hearing on the issue of whether the prosecutor intentionally provoked Hagege into moving for a mistrial; (2) the district court erred in denying Hagege's motion to dismiss count one of the indictment based upon the statute of limitations; (3) the district court's admission of foreign bank records violated the Confrontation Clause of the Sixth Amendment; and (4) the district court erred in denying Hagege's motion for a mistrial as to the second trial based upon the district court's reference to a jury instruction relating to prior convictions. For the reasons given below, we will affirm the conviction, vacate the sentence, and remand the case for further proceedings in light of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005).

I.

On September 24, 2003, Hagege was named in a four-count indictment charging him with making a false declaration in bankruptcy, in violation of 18 U.S.C. § 152(3) (count one), concealment of assets in bankruptcy, in violation of 18 U.S.C. § 152(1) (count two), and false representation of a social security number, in violation of 18 U.S.C. § 408(a)(7)(B) (counts three and four). Count one of the indictment alleges that Hagege made a false declaration in bankruptcy on or about January 27, 1998. Absent any suspension period, the five-year statute of limitations applicable to count one would have expired on January 27, 2003, approximately eight months before the indictment was filed.

On September 26, 2002, the government moved for a suspension of the statute of limitations, pursuant to 18 U.S.C. § 3292, in order to obtain foreign evidence from Israel. In the motion, the government requested that the suspension period

begin on March 21, 2002, the date of its official Request for Assistance pursuant to the Treaty of Mutual Legal Assistance in Criminal Matters ("MLAT") to Israel. In an order dated September 30, 2002, the district court granted the motion and suspended the statute of limitations from March 21, 2002 "until final action is taken by Israel on the government's request for assistance, provided that this period of suspension may not exceed three years." (AER[1] at 245.)

The MLAT request sought production of records of bank accounts in Israel in the name of Hagege for the period from January 1, 1994 to the present. With regard to certification of the authenticity of the records, the MLAT request provided, in relevant part, as follows:

> In order to obtain the evidence sought as quickly as possible for use in the pending investigation, the United States will at this time accept the evidence sought without execution of the certifications enclosed at the end of this request (the certifications are required for the use of the evidence at trial, but are not required for investigative purposes). Thereafter, when the time for trial in the United States approaches, the United States requests that some or all of the non-certified evidence be resent to the United States in certified form as the evidence cannot be admitted in court in the U.S. without these certifications.

(AER at 198.)

On June 18, 2002 and June 21, 2002, the Israeli government received two batches of uncertified bank records which it forwarded to the U.S. government in response to the MLAT request. In a follow-up letter dated July 18, 2002, which iden-

---

[1]Citation to "AER" refers to the Cross-Appellant's Excerpts of Record. Citation to "GER" refers to the Government's Excerpts of Record.

tified "MLAT request - Hagege" as the subject of the letter, the Israeli government stated, "[t]he above captioned request was executed." (AER at 332.) The July 18, 2002 letter also stated, "in the future, should you need certified copies of the bank statements please let me know." (AER at 332.)

Thrice between March 2003 and early December 2003, the U.S. government requested the Israeli government to produce a certificate of authenticity pertaining to the documents it had already sent, as well as additional documents responsive to the MLAT request. On December 18, 2003, the Israeli government produced the requested certificate of authenticity via facsimile. On or about the same date, the Israeli government informed the U.S. government that Bank Hapoalim possessed additional documents relating to six accounts held by Hagege, which had not been previously produced due to an oversight. On December 23, 2003, the U.S. government received the additional documents.

On December 29, 2003, Hagege moved to dismiss the false declaration charge in count one of the indictment based on the statute of limitations. Hagege argued that the Israeli government took "final action" on the March 21, 2002 request when the Israeli authorities first produced documents responsive to the request in June 2002. Hagege contended that the MLAT request did not contain a request for certification. At most, Hagege argued, the suspension period lasted six months pursuant to 18 U.S.C. § 3292(c)(2). Adding a six-month suspension period to the five-year statute of limitations, Hagege contended that the statute of limitations expired, at the latest, on July 27, 2003. Since the indictment was filed two months later on September 24, 2003, Hagege argued that count one of the indictment was untimely.

In opposition to the motion, the government contended that "final action" was not taken by the Israeli government on the MLAT request until December 2003, when the Israeli government produced the certificate of authenticity and the addi-

tional responsive documents. The government argued that the statute of limitations was therefore suspended from March 21, 2002 until December 2003. Therefore, the government posited, the statute of limitations was suspended when count one of the indictment was filed on September 24, 2003.

The district court agreed with the government and denied the motion to dismiss. Rejecting Hagege's reading of the MLAT request as "too narrow[ ]," the district court found that the MLAT request included a request for certification. The district court found that the Israeli government did not produce the certification or the requested documents until December 2003, and, therefore, that "final action" did not occur until December 2003. For these reasons, the district court concluded that count one of the indictment was not time-barred.

On December 22, 2003, prior to the start of trial, the government moved for an order ruling that foreign records obtained from banks in Luxembourg and Israel would be admitted pursuant to 18 U.S.C. § 3505, based upon certificates of authenticity. Hagege opposed the motion based upon several arguments, including the argument that the business records constituted inadmissible hearsay. Hagege did not directly challenge the admission of the bank records based upon a violation of the Confrontation Clause. However, the government raised the issue of whether the admission of the records violated the Confrontation Clause in its reply memorandum. With the exception of some documents excluded as irrelevant, the district court permitted the admission of the foreign bank records under § 3505.

Trial commenced on January 15, 2004. During trial, pursuant to the district court's ruling under § 3505, the government introduced the foreign bank records into evidence, but not the certificates of authenticity.

On the third day of trial, the district court declared a mistrial after a government witness, Anthony Keats, testified that

Hagege was involved in a pornography business. The government had proffered that Keats, a lawyer who had represented Polo Ralph Lauren Corporation ("Polo") in an unrelated civil action against Hagege, would testify about Hagege's efforts in transferring assets in violation of a court order entered in the civil action. After Keats took the stand, the government asked Keats about the nature of the civil action and the judgment that was entered. Keats testified that the civil action was based on Hagege's counterfeiting of Polo's trademark, and that the judgment included a $8.8 million damage award. The government asked Keats whether Polo had ever collected the money. When Keats testified that Hagege had not paid the money, the government asked Keats what steps Polo had taken in order to collect the money. Keats responded that Polo had conducted an investigation to determine the whereabouts of the money that Hagege had received from the counterfeiting activity. The government then prodded Keats about the specifics of the investigation:

> PROSECUTOR: What else did you do, Mr. Keats, in order to try to collect your judgment?
>
> WITNESS: In terms of the investigation or —
>
> PROSECUTOR: Was there more that you did in terms of the investigation?
>
> WITNESS: Well, the investigation — we, in terms of depositions, we took a significant number of depositions of various parties who may have been involved in some of these transactions. *I recall there was one gentleman who was a partner of Mr. Hagege who had set up a pornography business with Mr. Hagege —*

(AER at 390-91) (emphasis added). Hagege's counsel objected and requested a sidebar. The district court sustained the objection and at sidebar admonished the prosecutor, regarding Keats' testimony:

COURT:          Did you talk to this witness before you put him on the stand? What kind of nonsense is this?

PROSECUTOR:  Your Honor, I didn't expect him to say that.

COURT:          Shall I bring him over here and tell him? We're not trying to pillory this man.

PROSECUTOR:  Your Honor, that was not the intent at all. I had no idea that that was going to come up.

. . .

COURT:          I'm inclined to grant a mistrial.

PROSECUTOR:  Your Honor, the question — if we could go back — it was: What other investigation did you do? I had no idea that was going to come out.

COURT:          Well, it's not a punishment against the Government. Obviously, you didn't ask him to say that; but the problem is that he said it.

. . .

> PROSECUTOR: That was not the intent. It was one statement by a witness that was not anticipated by anybody, Your Honor; and I believe it would be inappropriate to grant a mistrial at this time.

(AER at 391-94.) Hagege's counsel made an oral motion for a mistrial. The district court granted the motion and declared a mistrial, finding that "the statement was so prejudicial the jury can't possibly forget it." (AER at 397.)

Thereafter, Hagege filed a motion for an evidentiary hearing to inquire into whether the prosecutor intentionally provoked the motion for a mistrial, in which case retrial would have been barred by the Double Jeopardy Clause. The government opposed the motion. In an affidavit attached to the government's opposition memorandum, the prosecutor stated that during the pretrial meetings, Keats "did not ever mention the word pornography or state that he had taken the deposition of a person who was in the pornography business with defendant." (AER at 429.) At oral argument, Hagege's counsel argued that the prosecutor's declaration left open the question whether she had discussed the "adult-oriented business" with him, or some other euphemism for the word "pornography." In response, the prosecutor represented to the district court at oral argument that "we never discussed the adult entertainment business, the adult-oriented business, or any other way to describe the pornography business during the six hours that we met with Mr. Keats." (AER at 453.) Accepting the government's representation, the district court denied the motion for an evidentiary hearing. Citing to its earlier tentative ruling, the district court reasoned:

> [T]here is no conceivable reason that the prosecutor would have wanted to trigger a mistrial motion by the defense. The Government's witnesses were ready and available; evidence was being admitted as antici-

pated by the Government. It is inconceivable to the Court that [the prosecutor] decided, on the third day of trial, to sabotage her own trial and start over.

(GER at 48.)

On the fifth day of retrial, the district court provided a copy of the jury instructions to the jury. The district court then proceeded to read the instructions to the jury. The following jury instruction was included in the packet of instructions:

You have heard evidence that defendant has previously been convicted of a crime. You may consider that evidence only as it may affect the defendant's believability as a witness. You may not consider a prior conviction as evidence of guilt of the crime for which the defendant is now on trial.

(AER at 466.) Upon reaching the foregoing instruction, the district court paused, did not read the instruction, and made the following remarks:

COURT:          I don't believe this next instruction is properly in this packet, and I think it has been put in by mistake from another case. Top of page 7.

PROSECUTOR:     The first paragraph, I agree, your Honor. That should not be in there.

DEFENSE:        Yes, your Honor.

COURT:          As you can imagine, we thought the trial might be going on longer than it did and so I have been scurrying back and forth to my

> secretary saying, "Prepare this pack of instructions." So please take your pen or pencil and whatever you've got and cross out the instruction on the top of page 7 because it is not from this trial.

(GER at 91-92.)

Hagege moved for a mistrial, arguing that the inclusion of the jury instruction in the packet of instructions gave the jury the impression that Hagege had a prior conviction. The district court denied the motion, finding that there was no reason to believe that the jury would disbelieve his statement that the instruction "was inadvertently pulled from another case and it ha[d] nothing to do with this case." (GER at 103.)

The jury returned a guilty verdict on all counts. Thereafter, the district court held a sentencing hearing. Citing to *United States v. Ameline*, 376 F.3d 967 (9th Cir. 2004), *superceded by* 409 F.3d 1073 (9th Cir. 2005) (en banc), which was controlling law at the time,[2] the district court stated that it would "use and follow the [Federal Sentencing] [G]uidelines to determine the appropriate sentence but w[ould] not enhance unless the facts in support of the enhancement or adjustment were found by the jury." (GER at 140.) Constrained by the facts found by the jury, the district court stated that it would calculate a Guideline base offense level of six and apply a two-level adjustment for concealing assets and a three-level adjustment for an amount of loss in excess of $10,000. The district court related that these adjustments were supported by facts necessarily found by the jury. Based upon a total offense

---

[2]In *Ameline*, we held that the Sixth Amendment right announced in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), applied to sentences imposed pursuant to the Federal Sentencing Guidelines and, therefore, that a defendant has the Sixth Amendment right to have a jury decide the facts underlying his sentence. 376 F.3d at 978-80.

level of eleven and a criminal history category of II, the district court calculated a range of ten to fourteen months and stated that it would impose a twelve month sentence.

In addition, noting that the Supreme Court had granted certiorari in two cases involving the applicability of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), to the Guidelines, the district court also arrived at two hypothetical sentences depending upon the outcome of those cases. The district court stated that if the Supreme Court were to determine that the Guidelines were unaffected by *Blakely*, it would enhance the sentence based upon judicially-found facts. Specifically, beginning with a base offense level of six, the district court would add ten levels for loss in the amount of $775,000, two levels for more than minimal planning, two levels for concealment of assets, and two levels for obstruction of justice, for a total offense level of twenty-two. With a criminal history category of II, the district court determined that it would impose a sentence of forty-six months. The district court related that, alternatively, if the Supreme Court were to determine that the Guidelines were facially invalid, it would look at the factors set forth in 18 U.S.C. § 3553 and select a four-year sentence.

The district court sentenced Hagege to twelve months imprisonment, three years supervised release, restitution of $775,668, and a special assessment of $400.

II.

A.

Hagege's first contention on appeal is that the district court erred in denying his motion for an evidentiary hearing regarding whether the prosecutor intentionally provoked him into moving for a mistrial. We review the district court's denial of the motion for an evidentiary hearing for an abuse of discretion. *See United States v. Hernandez*, 80 F.3d 1253, 1261 (9th

Cir. 1996), *overruled on other grounds by Muscarello v. United States*, 524 U.S. 125, 118 S. Ct. 1911 (1998).

**[1]** "The Double Jeopardy Clause provides criminal defendants the right to have their case heard and a verdict returned by the jury originally impaneled." *Greyson v. Kellam*, 937 F.2d 1409, 1413 (9th Cir. 1991). Here, we are concerned with the contours of that right when the defendant himself moves for, and is granted, a mistrial. When a mistrial is declared at the behest of the defendant, there is a "narrow" exception to the general rule that the Double Jeopardy Clause is no bar to retrial. *Oregon v. Kennedy*, 456 U.S. 667, 673, 102 S. Ct. 2083, 2088 (1982). Under that exception, a defendant who has moved for a mistrial may invoke the bar of double jeopardy where "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at 679, 102 S. Ct. at 2091. Prosecutorial misconduct alone, in the absence of such an intent, does not invoke the bar of double jeopardy. *See id.* at 675-76, 102 S. Ct. at 2089. For example, "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, [ ] does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* Thus, in determining whether the protection of the double jeopardy bar applies, the district court must examine the intent of the prosecutor. *Id.* at 675, 102 S. Ct. at 2089. Inference of the existence or nonexistence of intent should be based upon the "objective facts and circumstances." *Id.*

Hagege asserts that the district court lacked a sufficient factual basis to determine that an evidentiary hearing regarding prosecutorial intent was unnecessary. Hagege maintains that an evidentiary hearing was necessary to determine whether the prosecutor had discussed the issue of pornography with Keats prior to trial. The government responds that the district court accepted the prosecutor's representation at oral argument that Keats and the government "never discussed the

adult entertainment business, the adult-oriented business, or any other way to describe the pornography business during the six hours that we met with Mr. Keats." (AER at 453.) The government posits that an evidentiary hearing was unnecessary since the district court was familiar with the objective facts and circumstances of the case and found no evidence that the prosecutor intended to provoke the mistrial.

**[2]** This Court has not had the occasion to decide under what circumstances a district court, presented with a double jeopardy claim that the prosecutor intended to provoke a mistrial, must hold an evidentiary hearing. However, several other courts of appeals have addressed the issue, with varying approaches. *See, e.g.*, *United States v. Curry*, 328 F.3d 970, 974 (8th Cir. 2003); *United States v. Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993); *United States v. Oseni*, 996 F.2d 186, 188 (7th Cir. 1993); *United States v. White*, 914 F.2d 747, 752 n.1 (6th Cir. 1990); *United States v. Wentz*, 800 F.2d 1325, 1328 (4th Cir. 1986).

Adopting a methodical approach to the issue, the Court of Appeals for the Seventh Circuit has set forth a two-step procedure to guide a court in determining whether an evidentiary hearing is necessary. *See Oseni*, 996 F.2d at 188. Under that approach, the district court should, first, elicit an informal explanation from the prosecutor as to the reason for the misconduct, and, second, assess the progress of the trial. *Id.* If the prosecutor's explanation is reasonable and the trial was not going poorly for the government, the district court may accept the prosecutor's explanation without the need for an evidentiary hearing. *Id.*

**[3]** Taking a more flexible and seemingly more deferential approach, the Courts of Appeals for the Fourth Circuit and the Sixth Circuit have stated that a hearing is required "only if there existed a genuine issue in the mind of the trial court concerning the prosecutor's intent." *White*, 914 F.2d at 752 n.1 (citing *Wentz*, 800 F.2d at 1328). Thus, for example, in *Wentz*,

the court found no reversible error in the district court's failure to hold an evidentiary hearing before retrial. 800 F.2d at 1327-28. In deferring to the district court's finding, the *Wentz* court underscored that "[t]he trial judge was quite familiar with the events surrounding defendant's motion for a mistrial . . . [and] was uniquely positioned to characterize the conduct of the government . . ." *Id.* at 1328. The court further reasoned that there was nothing in the record to indicate that the district court's finding that no "goading" took place was incorrect. *Id.*

The Court of Appeals for the Eighth Circuit has taken a similar approach. In *Curry*, the court accepted "[t]he district court['s] conclu[sion] that because it had heard the trial and was familiar with the objective facts and circumstances of the case, a hearing was not necessary." 328 F.3d at 974.

Similarly, the Court of Appeals for the Second Circuit has stated that "[n]o rule of law requires a hearing in this sort of case where the relevant facts can be ascertained from the record." *Pavloyianis*, 996 F.2d at 1475. In *Pavloyianis*, rejecting the defendant's contention that an evidentiary hearing was necessary, the court reasoned that the district court had presided over all the proceedings and reviewed the affidavits, and had not found the slightest indication or evidence of prosecutorial misconduct in connection with the government witness' perjury. *Id.*

In this case, the government's witness testified that Hagege was involved in a pornography business. After the testimony, the district court asked the prosecutor at sidebar, "What kind of nonsense is this?" (AER at 391.) In response, the prosecutor explained that she had not expected the witness to give that testimony and it had not been her intent for him to do so. The district court accepted the prosecutor's explanation, stating "[o]bviously, you didn't ask him to say that; but the problem is that he said it." (AER at 394.) Hagege contends that the prosecutor's declaration in opposition to his motion did not address whether the prosecutor discussed the issue of pornog-

raphy with Keats under any euphemism. However, the district court elicited, and accepted, the prosecutor's representation at oral argument that she did not discuss the issue of pornography or any euphemism thereof with Keats during their six-hour pretrial meeting. Having presided over the entire proceedings and reviewing the affidavits, the district court was uniquely positioned to evaluate the prosecutor's conduct. There is nothing in the record that calls into question the veracity of the prosecutor's representations.

Furthermore, the district court observed that the case had been going well for the government: "witnesses were ready and available; evidence was being admitted as anticipated by the Government." (GER at 48.) Based upon this assessment, the district court found "that there [wa]s no conceivable reason that the prosecutor would have wanted to trigger a mistrial motion by the defense." (GER at 48.) Hagege has not offered a single reason why the government would have wanted to sabotage a trial that was going well.

**[4]** In summary, the district court elicited reasonable explanations from the prosecutor regarding the alleged misconduct and assessed that the trial was going favorably for the government. Based upon all of the objective facts and circumstances, the district court concluded that there was no indication or evidence of prosecutorial misconduct intended to provoke a mistrial. Under any of the approaches formulated by our sister courts, we find no error in the district court's determination that an evidentiary hearing was unnecessary. Accordingly, we conclude that the district court did not abuse its discretion in denying the motion for an evidentiary hearing.

### B.

**[5]** Hagege next challenges the district court's denial of his motion to dismiss count one of the indictment based upon the statute of limitations. Pursuant to 18 U.S.C. § 3292, the government may seek the suspension of the running of a statute

of limitations for an offense to obtain evidence of the offense in a foreign country. Hagege argues that notwithstanding any allowable suspension period under § 3292, count one of the indictment was untimely. We review the district court's denial of the motion to dismiss *de novo* and its factual findings underlying the legal ruling for clear error. *United States v. DeGeorge*, 380 F.3d 1203, 1213 (9th Cir. 2004).

**[6]** Under § 3292, the period of suspension "begin[s] on the date on which the official request is made and end[s] on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b). The parties dispute the duration of the period of suspension. To determine the duration of the suspension period in this case, we address the following two-part question: (1) what is the scope of the official request made on March 21, 2002; and (2) when was "final action" taken on the official request.

1.

The government made an official MLAT request to Israel on March 21, 2002. Hagege contends that the MLAT request contained only a request for documents and expressly disavowed any need for certification of the documents. The government maintains that the MLAT request included a request for certification. The district court agreed with the government and read the MLAT letter as encompassing both a request for documents and a request for a certificate of authenticity. Based upon the relevant language in the MLAT request, we cannot say that the district court's reading was clearly erroneous.

Although the March 21, 2002 MLAT request allowed for the initial production of uncertified documents, it also requested that the documents be resent in certified form. The MLAT letter underscored the necessity of the certification "[i]n order for the requested bank records to be received as evidence in courts of the United States . . . ," and stated

"when the time for trial in the United States approaches, the United States requests that some or all of the non-certified evidence be resent to the United States in certified form." (AER at 198-99.) Throughout the MLAT request, the government reiterated a need for "certified" documents. (AER at 197-98, 203-04.) The "Procedures to Be Followed" section of the MLAT request contained specific instructions regarding completion of the certification form. (AER at 208-09.) Furthermore, the "Special Considerations Regarding Execution of this Request" section of the MLAT request asked that "particular care be taken to ensure that the forms are executed in precise accordance with their terms and the directions set forth in this request." (AER at 199.) Thus, the language of the MLAT request supports the district court's reading.

Hagege relies upon the Israeli government's July 2002 response to the MLAT request in support of his argument that the request did not contain a certification request. In that letter, the Israeli government stated, "[t]he above captioned request was executed," and stated "in the future, should you need certified copies of the bank statements please let me know." (AER at 332.) Hagege posits that if the MLAT request had included a certification request, then the Israeli government would not have viewed its mere production of documents as execution of the request.

Hagege's reliance on a foreign sovereign's response to determine the scope of the MLAT request is flawed for two principal reasons. First, there are inherent practical difficulties in defining the scope of a request *ex post facto* by reference to its response. Second, and more importantly, such a result would turn application of § 3292 on "the subjective opinion of foreign countries — whether correct or not — rather than on an objective assessment" of the scope of an official request. *See United States v. Torres*, 318 F.3d 1058, 1063 (11th Cir. 2003). These two considerations militate against reliance on Israel's response to determine whether the MLAT request contained a certification request.

**[7]** Hagege also argues that accepting the government's reading of the MLAT request would permit the government extrajudicially to extend the suspension period, thereby encouraging delay and upsetting the "separation of powers" of government. Hagege is correct, in part. By making an official request for certified documents with a future delivery provision, the government is able to extend the suspension period longer than had it insisted upon immediate delivery of the certified documents. However, § 3292 does not prohibit this kind of conduct. Generally speaking, the statute does not regulate the mechanics of how the government goes about obtaining foreign evidence. In particular, there is nothing in the statute which dictates when the government must demand delivery of a certificate of authenticity of the foreign documents it has requested. By implication, Congress has left these discovery-related matters to the discretion of the attorney for the United States. Thus, contrary to Hagege's suggestion otherwise, reading the MLAT request as encompassing a request for certification does not implicate separation of powers principles.

Moreover, as we noted in *United States v. Bischel*, 61 F.3d 1429, 1435 (9th Cir. 1995), there is no requirement in § 3292 that the government diligently seek evidence located in a foreign country since the statute has a built-in time limitation on the suspension period. The statute provides that the total period of suspension shall in no event exceed three years. 18 U.S.C. § 3292(c)(1). Further, the total period of suspension cannot exceed six months if final action is taken before the statute of limitations would have otherwise expired. 18 U.S.C. § 3292(c)(2). In enacting these time limitations, Congress took the potential for governmental delay into consideration. *Torres*, 318 F.3d at 1064. The inclusion of these time limitations in the suspension statute attempts to create a balance between permitting the government to obtain foreign evidence and ensuring that the defendant is given the protections of predictability and promptness which underlie statutes of limitations. Given these time limitations, we conclude that adopt-

ing the government's construction of the MLAT request would not result in unabashed delay.

**[8]** For the foregoing reasons, we conclude that the district court did not abuse its discretion in construing the MLAT request as containing both a request for documents and a request for certification.

2.

**[9]** The next issue is when the Israeli government took "final action" on the MLAT request as construed as a request for documents and certification. Although "final action" is not defined in § 3292, in *Bischel*, we held that " 'final action' for purposes of § 3292 means a dispositive response by the foreign sovereign to both the request for records and for a certificate of authenticity of those records, [when] both [a]re identified in the 'official request.' " 61 F.3d at 1434.

In *Bischel*, the government sent to the British government an official request seeking copies of certain bank records, copies of certain records of precious metals trading activity, and a certificate of authenticity of those records. *Id.* at 1432. By the time the indictment was returned, the British authorities had produced all of the documents requested, but not the certificate of authenticity. *Id.* In *Bischel*, we concluded that final action had not occurred by the time the indictment was returned because the British authorities had not decided whether they would comply with the request for certification. *Id.* at 1434. We reasoned that "pegging 'final action' to disposition, up or down, of each of the items in the official request provides a more certain benchmark by which to measure whether the action that has been taken is 'final' or not." *Id.*

**[10]** Under *Bischel*, therefore, we must determine when the Israeli government made a "disposition, up or down, of each of the items in the official request," including the request for certification. *Id.* The record indicates that in June 2002, the

Israeli government produced documents responsive to the MLAT request, but no certification. The Israeli government's July 18, 2002 letter, stating "in the future, should you need certified copies of the bank statements please let me know," was not a "disposition, up or down," of the certification request. *Id.* At this point, the Israeli government had not provided the certificate of authenticity, nor had it indicated it would not comply with the request for certification. The government continued to pursue the certificate of authenticity, making three requests between March 2003 and early December 2003. Finally, on December 18, 2003, the government received the certificate of authenticity via facsimile from Israel. Thus, under *Bischel*, "final action" for purposes of § 3292 could not have occurred before December 18, 2003, when the U.S. government received the requested certificate of authenticity. Accordingly, the statute of limitations was suspended from March 21, 2002 until, at least, December 18, 2003. Since the indictment was filed on September 24, 2003, we conclude that count one of the indictment was timely filed.[3] Accordingly, we find no error in the district court's decision to deny Hagege's motion to dismiss.[4]

## C.

Hagege next argues that the district court's admission of foreign records under 18 U.S.C. § 3505 violated Hagege's right of confrontation. A district court's evidentiary rulings

---

[3]Pursuant to 18 U.S.C. § 3292(c)(2), the total of all periods of suspension "shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section." Because "final action" was taken well after the statute of limitations — untolled — would have expired, the six-month limitation provided in § 3292(c)(2) does not apply.

[4]Because count one is not time-barred, we need not consider defendant's related argument that the district court's alleged error in not dismissing count one permeated the entire trial because the prosecutor was permitted to argue that defendant was a "liar."

are reviewed for an abuse of discretion. *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1062 (9th Cir. 2005). We review *de novo* a district court's admission of evidence in alleged violation of the Confrontation Clause. *United States v. Weiland*, 420 F.3d 1062, 1076 n.11 (9th Cir. 2005). If the defendant failed to object to the admission of evidence under the Confrontation Clause, we review for plain error. *United States v. Allen,* 425 F.3d 1231, 1235 (9th Cir. 2005).

**[11]** Pursuant to § 3505, "[i]n a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests . . ." to the requirements specified in the statute.[5] Under § 3505, a foreign certification serves to authenticate the foreign records, and thus "dispenses with the necessity of calling a live witness to establish authenticity." *United States v. Sturman*, 951 F.2d 1466, 1489 (6th Cir. 1991); 18 U.S.C. § 3505(a)(2) ("A foreign certification under this section shall authenticate such record or duplicate."). In addition, when a foreign certification meets the requirements of § 3505(a)(1), the statute prevents the exclusion of the foreign records as hearsay. *Sturman*, 951 F.2d at 1489.

Hagege raises the argument that the district court's admission of foreign records under 18 U.S.C. § 3505 violated his right of confrontation under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). In *Crawford*, the Supreme Court considered whether a trial court's admission of a tape-

---

[5]The foreign certification must attest that — "(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters; (B) such record was kept in the course of a regularly conducted business activity; (C) the business activity made such a record as a regular practice; and (D) if such record is not the original, such record is a duplicate of the original; unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." 18 U.S.C. § 3505(a)(1).

recorded out-of-court statement made by a witness while in police custody, where the defendant had no opportunity to cross-exam the witness, violated the defendant's Sixth Amendment right of confrontation. *Id.* at 38, 124 S. Ct. at 1357. In deciding that there was a violation of the Sixth Amendment, the Court determined that the witness's statement, made while in police custody, fell within a core class of "testimonial statements" that requires Confrontation Clause protection. *Id.* at 68-69, 124 S. Ct. at 1374.

**[12]** The *Crawford* Court explained that, as to testimonial statements, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation itself. *Id.* at 68-69, 124 S. Ct. at 1374. The Court stated, "[w]here testimonial evidence is at issue [ ], the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68, 124 S. Ct. at 1374. Although the *Crawford* Court did not offer a comprehensive definition of testimonial evidence, the Court did cite to various formulations of this core class of testimonial statements, *see id.* at 51-52, 124 S. Ct. at 1364, and stated, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," *id.* at 68, 124 S. Ct. at 1374.

In resurrecting the demands of the common law for testimonial evidence, the *Crawford* Court was departing from prior precedent, specifically the case of *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980). In *Roberts*, the Court ruled that an unavailable witness's statement against a criminal defendant may be admitted so long as it falls within a "firmly rooted hearsay exception," or bears "particularized guarantees of trustworthiness." 448 U.S. at 66, 100 S. Ct. at 2539. *Crawford* called the *Roberts* framework unpredictable and incapable of protecting the core testimonial statements that the Confrontation Clause was meant to exclude. 541 U.S. at 62-63, 124 S. Ct. at 1371.

**[13]** Significantly, however, the *Crawford* Court was careful to distinguish between testimonial statements, which are subject to Confrontation Clause scrutiny, and non-testimonial statements, which need not be. The Court explained that applying the *Roberts* framework to non-testimonial statements would not be inconsistent with the Framers' understanding of the Confrontation Clause, nor would be application of any approach that exempts non-testimonial statements from Confrontation Clause scrutiny altogether. *Id.* at 68, 124 S. Ct. at 1374. Thus, the stringent requirement of confrontation resurrected in *Crawford* does not apply to non-testimonial evidence.

**[14]** Although the *Crawford* Court did not provide a definition of the term "non-testimonial evidence," the Court did indicate that business records are an example of the kind of statements which by their nature are not testimonial. *Id.* at 56, 124 S. Ct. at 1367. Business records fall outside the core class of "testimonial evidence," and thus are not subject to the absolute requirement of confrontation established in *Crawford*. We conclude therefrom that foreign business records admitted under § 3505 are not subject to the *Crawford* requirement of confrontation.[6]

**[15]** We need not decide here whether, post-*Crawford*, business records remain subject to a challenge that their admission violates the Confrontation Clause under *Roberts*. Even assuming that a Confrontation Clause challenge to non-testimonial evidence under *Roberts* survives *Crawford*, the law in our Circuit establishes that the admission of the foreign bank records under § 3505 meets the *Roberts* test because the records bear indicia of reliability and the hearsay exception for business records is firmly rooted. *United States v. Miller*,

---

[6] The foreign certifications attesting to the authenticity of the business records were not admitted into evidence. Thus, we do not consider whether admission of the foreign certifications would have violated the Confrontation Clause under *Crawford*.

830 F.2d 1073, 1077-78 (9th Cir. 1987). We therefore conclude that under a *de novo* or plain error standard,[7] the district court's admission of the foreign business records did not violate the Confrontation Clause.

In addition to the Confrontation Clause challenge, Hagege suggests that even if the foreign records were properly authenticated under § 3505, the records constitute inadmissible hearsay. In support of this argument, Hagege cites to the case of *United States v. Yin*, 935 F.2d 990 (9th Cir. 1991). In *Yin*, we made the unremarkable observation that a document which is authentic may still contain inadmissible hearsay. *Id.* at 1000 ("The government cites no authority for the proposition that hearsay within any authenticated documents is automatically admissible. This argument confuses discrete foundational requirements for the admission of a writing; a document may be authentic, but still contain inadmissible hearsay."). Section 3505, however, provides a certification procedure by which a foreign business record may be both excepted from the hearsay rules and authenticated. 18 U.S.C. § 3505(a). Here, the district court found that the government had complied with that procedure and thus admitted the foreign business records into evidence. We find no error in the district court's ruling.

Based upon the foregoing, we conclude that the district court's admission of the foreign bank records was not erroneous.

### D.

As a final argument, Hagege contends that the district court erred when it denied his motion for a mistrial as to the second trial based upon the district court's accidental inclusion of a

---

[7]We need not decide whether Hagege raised his Confrontation Clause argument before the district court, since, as discussed, we find no error under either a *de novo* or plain error standard.

jury instruction relating to prior convictions. A district court's denial of a motion for mistrial is reviewed for abuse of discretion. *United States v. Allen*, 341 F.3d 870, 891 (9th Cir. 2003).

**[16]** The district court did not abuse its discretion in denying Hagege's motion for a mistrial. As the district court observed, there was no reason to believe that the jury would disbelieve his statement that the instruction "was inadvertently pulled from another case and it ha[d] nothing to do with this case." (GER at 103.) Further, the district court asked the jury to cross out the inadvertently included instruction. Given these remedial steps, the district court did not abuse its discretion in denying the motion for a mistrial. *See United States v. Olano*, 62 F.3d 1180, 1201-02 (9th Cir. 1995) (finding no reversible error in the district court's inadvertent mention of a jury instruction relating to penalties where the district court told the jury that some changes would be made to the final written instructions and the final set of instructions did not include the improper instruction).

### III.

The government appeals the district court's sentence in light of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005). Because the government preserved this error at sentencing, the harmless error standard applies. *See United States v. Seschillie*, 310 F.3d 1208, 1214 (9th Cir. 2002).

As related in the factual discussion above, at sentencing, the district court stated that it would "use and follow the guidelines to determine the appropriate sentence but w[ould] not enhance unless the facts in support of the enhancement or adjustment were found by the jury." (GER at 140.) Constrained by the facts found by the jury, the district court stated that it would calculate a Guideline base offense level of six and apply a two-level adjustment for concealing assets and a three-level adjustment for an amount of loss in excess of $10,000. Based upon a total offense level of eleven and a

criminal history category of II, the district court calculated a range of ten to fourteen months and stated that it would impose a twelve month sentence. The district court stated, however, that if the Supreme Court were to determine that the Guidelines were unaffected by *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), it would enhance the sentence based upon judicially-found facts.

**[17]** In *Booker*, the Supreme Court held that while its decision in *Blakely* applies to the Federal Sentencing Guidelines, a district court may engage in judicial factfinding without implicating the Sixth Amendment so long as the district court treats the Guidelines as advisory. *See Booker*, 543 U.S. 220, 125 S. Ct. at 750, 756-57. Here, the district court committed nonconstitutional error in viewing the Guidelines as mandatory and refusing to increase Hagege's sentence on the basis of judicial factfinding. *See id.* (holding that the Guidelines are advisory, not mandatory); *United States v. Ameline*, 409 F.3d 1073, 1084 n.8 (9th Cir. 2005) ("In a case where the district court did not treat the sentencing guidelines as advisory but the defendant's sentence was not enhanced by extra-verdict findings . . . [a] nonconstitutional error occurs."). Moreover, based upon a review of the transcript of the sentencing hearing, it is clear that the error was not harmless because the district court expressly stated that it would have increased the sentence based upon judicial factfinding had it been permitted to do so. Accordingly, we will vacate the sentence and remand to the district court for resentencing in light of *Booker*. In resentencing the defendant, the district court "is permitted to take a fresh look at the relevant facts" and the Guidelines. *Ameline*, 409 F.3d at 1085.

## IV.

For the foregoing reasons, we conclude that the district court did not err in denying defendant's motion for an evidentiary hearing to determine whether the prosecutor intended to provoke a mistrial. We conclude that count one of the indict-

ment was not barred by the statute of limitations. The admission of the foreign bank records did not violate defendant's Sixth Amendment right of confrontation. Further, the district court did not abuse its discretion in denying the motion for a mistrial as to the second trial based upon the district court's reference to a jury instruction relating to prior convictions. Therefore, we will affirm the conviction. However, we will vacate the sentence and remand to the district court for resentencing in light of *Booker*.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING**.