**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

RANDY W. JENKINS,
              *Defendant-Appellant.*

No. 09-10109

D.C. No.
2:06-cr-00464-
SRB-2

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

v.

IRA W. GENTRY, Jr., AKA Ira
Willie Gentry, AKA Donald Isaac
Williams, AKA Don Williams,
AKA Fred Koone, AKA Don
Brown,
              *Defendant-Appellant.*

No. 09-10110

D.C. No.
2:06-cr-00464-
SRB-1

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
September 9, 2010—San Francisco, California

Filed January 25, 2011

Before: Betty B. Fletcher, Richard C. Tallman and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge B. Fletcher

1581

## COUNSEL

Phillip Edward Hantel, Phoenix, Arizona, for defendant-appellant Randy Jenkins.

Daniel Robert Drake, Drake Law PLC, Phoenix, Arizona, for defendant-appellant Ira W. Gentry.

Frank Phillip Cihlar, Michael Vasiliadis, and Elissa Hart-Mahan, United States Department of Justice, Tax Division, Washington, D.C.; Frank T. Galati and Reid Charles Pixler, Office of the United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

### INTRODUCTION

This case arises out of a "pump and dump" scheme during which Randy Jenkins and Ira Gentry conspired to secretly acquire millions of shares of UniDyn Corporation stock, artificially inflate its value, sell it for significant profit, and launder the proceeds. After a sixteen-day trial, a jury convicted Jenkins and Gentry ("Appellants") of multiple counts of securities fraud (15 U.S.C. §§ 78ff, 78j(b)[1]); wire fraud (18 U.S.C. § 1343); international concealment money laundering (18 U.S.C. § 1956(a)(2)(B)(i)); concealment money laundering (18 U.S.C. § 1956(a)(1)(B)(i)); and transactional money laundering (18 U.S.C. § 1957(a)). The jury also convicted each appellant of one count of tax evasion (26 U.S.C. § 7201) and for conspiracy to defraud the United States and commit wire fraud, securities fraud, and mail fraud (18 U.S.C. § 371).

The district court sentenced Jenkins to 90-months imprisonment, and Gentry to 180-months imprisonment. In addition, the district court ordered appellants to forfeit approximately $9 million in ill-gotten gains to the government. In a related

---

[1]Unless otherwise noted, all citations are to the 2006 edition of the United States Code.

civil action, the government sought forfeiture of Gentry's residence.

Appellants timely appeal both their convictions and sentences. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we now affirm.

The principal legal issue we face is whether 18 U.S.C. § 3292 suspended the running of the statute of limitations for all counts. Section 3292 permits the district court to suspend the statute upon finding that the government reasonably believes evidence of a crime under investigation by a grand jury is in a foreign country and has requested that evidence. Subject to defined outer limits, the suspension period lasts until the foreign government has taken "final action" on the official request.

Appellants argue that an application to suspend the running of the statute of limitations must be supported by a sworn affidavit or other material of evidentiary value and that § 3292 does not permit the district court to suspend the statute of limitations if the government applies after the statute has expired. The fact that the government submitted its official request for evidence to a foreign government before the expiration of the statute is irrelevant, they argue. Consequently, they contend that even though the government submitted a sworn affidavit in support of its § 3292 application on June 20, 2005, the district court could not suspend any of the pertinent statutes of limitation that expired before that date. Finally, appellants argue that Canada took "final action" on or before July 5, 2005, ending the suspension period and rendering several counts of the indictment untimely. We agree only with appellants' first contention and conclude that the statute of limitations had not expired on any counts before the grand jury returned its indictment.

In addition, both appellants contend (1) there was insufficient evidence to support conviction on many counts; (2) the

jury's instructions on money laundering were reversible error; and, (3) the district court erred at sentencing in calculating the amount of loss and number of victims. Jenkins also argues that his sentence was substantively unreasonable. Gentry argues that the district court wrongly denied his motion to sever his trial from Jenkins's, and that the district court erred in denying his motion for additional cross examination of a government witness. We reject each of these claims and affirm the convictions and sentences.

## BACKGROUND

In the early 1990s, Gentry formed Universal Dynamics, a "vibration testing" company that analyzed the quality of circuit boards using shaking machines. Gentry was the president and owner of Universal Dynamics. Universal Dynamics also produced a line of hardware and software products which controlled the shakers and analyzed results. In 1996, Gentry learned of attempts to use infrared cameras to identify flaws in circuit boards. The concept was created by Irene Murphy, a student at General Motors Institute, but her research revealed that the technology was not viable for mass production. Gentry claimed to have invented the technology, called it the "Sterling concept," and proclaimed that it would revolutionize the industry.

In December 1997, Universal Dynamics merged with a shell corporation and became UniDyn Corporation. At the time it was created, UniDyn issued nearly fifteen million shares of stock to a Bahamian corporation called UniDyn, Inc. (UniDyn-Bahamas). UniDyn-Bahamas was created by Jenkins, a disbarred attorney and friend of Gentry's with expertise in setting up offshore corporations. UniDyn-Bahamas was a nominee entity with no independent business. Its registered agent and director were figureheads chosen to conceal Gentry and Jenkins's control. It later changed its name to Mearns Acceptance Corporation.

At its creation, UniDyn also issued approximately eight million shares to Universal Dynamics. Though the corporate tax returns and SEC filings for Universal Dynamics indicated that Gentry was only a minority shareholder, the other alleged shareholders included aliases for Gentry and Jenkins and the names of acquaintances who did not, in fact, own stock and were not aware appellants were using their names. In actuality, Gentry was the sole owner and president of Universal Dynamics.

UniDyn was publicly traded on the Over the Counter Electronic Bulletin Board. Because of its low share price (under $5 per share), it was called a "penny stock." As a publicly traded company, UniDyn was required to file annual and quarterly SEC reports. The reports were required to disclose any shareholders owning or controlling a 5% or greater interest in the company and to announce any significant events in the company. SEC filings did not reflect Gentry and Jenkins's beneficial ownership of either Universal Dynamics or Mearns.

Engineers at UniDyn and its subsidiaries tested Sterling between 1998 and 1999, and concluded that the technology was not commercially viable. Yet, in SEC filings and press releases, Gentry continued to falsely promote the company's prospects. Between 1997 and 2001, among other misrepresentations, Gentry claimed that Sterling was 100% effective at estimating the life span of circuit boards; UniDyn was pursuing a patent for Sterling; UniDyn had a commitment from Technet, a Japanese corporation owned by Hiroshi Tsuriya, to purchase $200 million in Sterling units; Sterling had been successfully tested by IBM; UniDyn had constructed a Sterling unit ready to be placed with a customer; and UniDyn had entered into a $900,000 licensing deal for Sterling. In addition, both Gentry and Jenkins posted messages on Raging Bull, an online investors's message board, touting UniDyn's potential, announcing lucrative deals, and attempting to assuage concerns about the identities of its largest shareholders, including those in Mearns.

Having "pumped" the value of UniDyn stock, appellants proceeded to "dump" their holdings. *See United States v. Laurienti*, 611 F.3d 530, 534 (9th Cir. 2010) (describing a "pump and dump" scheme). In early 2000, Gentry and Jenkins opened accounts for a number of nominee corporations and individual aliases at Thomson Kernaghan and Union Securities brokerage houses in Canada. Over the next few months, they transferred millions of UniDyn-shares held by UniDyn-Bahamas and Universal Dynamics to these accounts. Between March 7 and March 15, 2000, Jenkins and Gentry sold almost 900,000 shares from Universal Dynamics' Union Securities brokerage account in Canada, netting proceeds of $1.8 million. Between March and June 2001, they sold millions of shares of stock from accounts at Thomson Kernaghan, with net proceeds of over $6 million. Jenkins and Gentry continued to sell UniDyn stock from the Canadian accounts in the latter half of 2001 and in 2002.

Jenkins and Gentry wired funds from the Canadian brokerage accounts to a variety of bank accounts in the United States and abroad. The bulk of the funds were used for personal purchases and investments, including $300,000 in gold and silver coins and $70,000 in silver bullion in Jenkins's name at Monex Deposit Company, a $1.5 million home in Scottsdale for Gentry, several vehicles, and $30,000 worth of jewelry. In addition, appellants used approximately $2 million to make UniDyn appear profitable: $900,000 was used to fund a purported licensing deal of Sterling's technology, and $1 million was used to fund a "longtime shareholder's" investment in UniDyn. Neither Gentry nor Jenkins disclosed on their 2000 tax returns any income or profits from their nominees' sales of UniDyn stock.

The scheme began to unravel in April 2001, when Hiroshi Tsuriya, the president of Technet, informed a UniDyn subsidiary that he had never entered into an agreement to purchase over $200 million of Sterling units. Shortly after this information was conveyed to UniDyn's corporate counsel and board

of directors, Gentry resigned as CEO. In a May 2001 SEC filing, UniDyn's board of directors announced Gentry's resignation and stated recent evaluations of Sterling had revealed the product would have to be delayed and might not be viable. The price of UniDyn's stock and volume of shares traded dropped precipitously.

In 2001, the IRS began investigating Gentry and Jenkins for tax fraud and, pursuant to a tax treaty, obtained documents from Canada implicating appellants in securities, mail, and wire fraud. Pursuant to the terms of the treaty with Canada, however, the IRS could use those documents only for tax investigation purposes. On March 16, 2005, the government sent a request to Canada under the Treaty on Mutual Legal Assistance in Criminal Matters ("MLAT"), U.S.-Can., March 18, 1985, 24 I.L.M. 1092 (1985), requesting the records of Union Securities and Thomson Kernaghan accounts linked to Gentry, Jenkins, and aliases and nominee corporations associated with both.

On March 22, 2005, the government applied *ex parte* to the district court seeking suspension of the statute of limitations pursuant to 18 U.S.C. § 3292. The application included an unverified copy of the MLAT request and an unsworn memorandum. On March 23, 2005, the court issued an order suspending the statute of limitations, effective as of March 16, 2005. On June 20, 2005, the government submitted a "supplemental application" including a sworn declaration from IRS Agent Linda Wallace detailing why the government believed there was relevant evidence in Canada. The court issued a revised order on June 29, again suspending the statute of limitations as of March 16, 2005.

On May 3, 2006, a federal grand jury returned a fifty-nine count indictment charging Gentry and Jenkins with tax evasion, concealment money laundering, international concealment money laundering, securities fraud, wire fraud, and

conspiracy. Several counts of the indictment were voluntarily dismissed by the prosecution before trial.

After a sixteen-day trial, the jury convicted Jenkins of one count of conspiracy, two counts of securities fraud, one count of wire fraud, one count of tax evasion, eleven counts of international concealment money laundering, three counts of concealment money laundering, and three counts of transactional money laundering. Jenkins was acquitted of three counts of transactional money laundering and one count of wire fraud. The jury convicted Gentry of one count of conspiracy, nine counts of securities fraud, six counts of wire fraud, one count of tax evasion, eleven counts of international concealment money laundering, three counts of concealment money laundering, and four counts of transactional money laundering. Gentry was acquitted of two counts of transactional money laundering and one count of wire fraud.

The district court held a sentencing hearing on March 2, 2009. The district court applied a twenty-level upward adjustment for the amount of loss and a four-level upward adjustment because there were more than fifty victims. For Gentry, the district court additionally applied a three-level upward adjustment because Gentry acted as a manager and two additional levels because he abused a position of public or private trust. The Sentencing Guidelines recommended life in prison for Gentry and between 324 and 405 months for Jenkins. After weighing the factors enumerated in 18 U.S.C. § 3553(a), the district court sentenced Gentry to 180 months and Jenkins to 90 months of imprisonment.

## DISCUSSION

**I. The District Court Did Not Err in Suspending the Running of the Statute of Limitations Under 18 U.S.C. § 3292 from March 16, 2005 to April 12, 2006.**

[1] The statute of limitations for the non-capital federal offenses involved here is five years. 18 U.S.C. § 3282(a).

Nevertheless, 18 U.S.C. § 3292 extends the limitations period if evidence of an offense being investigated by a grand jury is in a foreign country. Section 3292 provides:

> (a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
>
> . . . .
>
> (b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.
>
> (c) The total of all periods of suspension under this section with respect to an offense —
>
> (1) shall not exceed three years; and
>
> (2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such a period would expire without regard to this section.

Appellants first contend that the district court erred in suspending the running of the statute of limitations based on the government's March 22, 2005, application, because the application did not satisfy the evidentiary requirements of subsec-

tion (a)(1). Second, appellants argue that the district court erred in concluding that the government's June 20, 2005 "supplement" to the March application cured any error and suspended the running of the statute of limitations on nine counts, the limitations period of which had expired between the March 16 MLAT request and the June 20 application. Third, appellants contend that Canada's July 5, 2005 response constituted a "final action" ending the suspension period under subsection (b), and that the statute of limitations on six counts thus ran before the indictment on May 3, 2006.

We review de novo a district court's denial of a motion to dismiss an indictment because of the statute of limitations. *United States v. DeGeorge*, 380 F.3d 1203, 1213 (9th Cir. 2004). Any factual findings underlying the denial are reviewed for clear error. *Id.*

A. *Evidence Necessary to Support an Application Under § 3292.*

**[2]** Before suspending the running of the statute of limitations, the district court must find by a preponderance of the evidence that (1) an official request has been made for the evidence and (2) it reasonably appears or appeared at the time the request was made that the evidence of the crime is or was in a foreign country. 18 U.S.C. § 3292(a)(1). "[T]he government has some burden to establish, as opposed to being able to merely assert without support, that the foreign evidence it seeks meets the section's requirements." *DeGeorge v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 219 F.3d 930, 937 (9th Cir. 2000); *see also United States v. DeGeorge*, 380 F.3d at 1215 (stating that district courts should not "simply rubber-stamp the government's request" but should "hold the government to its burden.").

**[3]** The Ninth Circuit has never addressed the issue of whether a § 3292 application must be supported by evidence of particular value. However, the Eleventh Circuit squarely

confronted this question in *United States v. Trainor,* 376 F.3d 1325, 1330-35 (11th Cir. 2004). In *Trainor*, the court held that a § 3292 application must be supported by materials that "include or [are] accompanied by some indicia of reliability." *Id* at 1331. The court concluded that because § 3292 extends the limitations period (itself designed to ensure the reliability of evidence) and an application under § 3292 is made *ex parte*, the government must meet a "minimum evidentiary burden." *Id.* at 1332.

According to *Trainor*, the § 3292 preponderance standard is quite broad. *Id.* at 1332-33. The government can satisfy its burden of proof under § 3292(a)(1) "by including a sworn or verified application containing the necessary factual information, testimony by Government officials, affidavits, declarations, exhibits, or other materials of evidentiary value," even including hearsay evidence. *Id*. Nevertheless, a "mere summarization of the evidence in the Government's possession . . . standing alone, does not satisfy the Government's burden." *Id*. at 1333; *see also United States v. Wilson*, 322 F.3d 353, 363 (5th Cir. 2003) (holding that the government did not meet its § 3292(a)(1) burden when it presented "circumstantial evidence of questionable origin" and the testimony of a witness "wholly without personal knowledge" of the issues).

**[4]** *Trainor* is consistent with § 3292 and this circuit's precedent. *See United States v. DeGeorge*, 380 F.3d at 1215; *DeGeorge v. U.S. Dist. Ct.*, 219 F.3d at 937. Accordingly, we hold that when the government moves to suspend the statute of limitations under § 3292, it must present "something with evidentiary value . . . tending to prove it is reasonably likely that evidence of the charged offenses is in a foreign country" — not merely unsupported assertions. *See Trainor*, 376 F.3d at 1332-34.

**[5]** The government contends that the MLAT request submitted with the March 16, 2005 application contained the necessary indicia of reliability, as it was (1) sixteen pages long

and included significant detail on the facts of the investigation and (2) prepared pursuant to the United States's treaty obligations with Canada. We need not decide that question. Whether or not the March 22, 2005 application was sufficient, the government's June 20, 2005 "supplemental application" clearly was adequate. The June 20 application included the sworn declaration of IRS Agent Linda Wallace, who described the IRS's investigation, the grand jury investigation and the evidence already recovered from Canada tending to indicate that further evidence of the offenses was abroad. Agent Wallace's declaration bore the necessary indicia of reliability and supported the district court's finding, by a preponderance of the evidence, that the government reasonably believed evidence of appellants' crimes was in Canada.

**[6]** We hold that the district court did not err on June 29, 2005, in issuing an order suspending the statute of limitations. Because § 3292 clearly states that the suspension period begins on the date the official request to the foreign government is made, the district court did not err in ordering the suspension period to begin on March 16, 2005, when the government submitted its MLAT request to Canada. *See* 18 U.S.C. § 3292(b); *United States v. Bischel*, 61 F.3d 1429, 1434 (9th Cir. 1995).

### B.   Timing of a § 3292 Application

Appellants next contend that the district court erred in suspending the statute of limitations on counts two, four, twelve, twenty-four, twenty-six, thirty-five to thirty-seven, fifty-three and fifty-four, because the statute of limitations for those counts expired before the government applied for suspension under § 3292. Appellants argue that § 3292 does not authorize a district court to "revive" an already expired statute of limitations, regardless of whether the government makes its official request for evidence from the foreign country before the statute expires. Our ruling in *Bischel*, 61 F.3d at 1434, forecloses appellants' argument.

In *Bischel*, defendant was indicted in 1992 for criminal conduct occurring before 1985. 61 F.3d at 1431-32. As here, the district court issued an order suspending the running of the statute of limitations under § 3292, effective from the date of the government's official request for the evidence. *Id.* Bischel "contend[ed] that the district court erred in holding that the statute of limitations was suspended as of July 27, 1989, when the letters rogatory were issued, instead of November 20, 1989, when the order suspending the statute was entered, on the ground that a § 3292 order cannot revive or extend a period of limitations." *Id.* at 1434. The court disagreed, stating "the statute plainly contemplates that the starting point for tolling the limitations period is the official request for evidence, not the date the § 3292 motion is *made or granted*." *Id.* (emphasis added). Indeed, "[t]he statute itself specifies the only relevant time the application must be made: 'before return of an indictment.' " *Id.* (quoting *United States v. Miller,* 830 F.2d 1073, 1076 (9th Cir. 1987)).

**[7]** Under *Bischel*, the only temporal requirements of a § 3292 application are (1) that the official request for evidence in a foreign country be made before the statute of limitations expires and (2) that the application for suspension be submitted to the district court before the indictment is filed. 61 F.3d at 1434; *see also United States v. Daniels*, No. C 09-00862 MHP, 2010 WL 2680649, at *5-6 (N.D. Cal. July 6, 2010) (analyzing the holding of *Bischel*). We recognize that there is disagreement among the circuits on this issue. *Compare United States v. Kozeny*, 541 F.3d 166, 174 (2nd Cir. 2008) ("The fact that the statute requires a retroactive starting date for the suspension period does not speak to whether applications for suspension must be filed before the statute of limitations has otherwise run."), *with United States v. Hoffecker*, 530 F.3d 137, 163 n.4 (3rd Cir. 2008) (stating that a majority of the panel believed "there is no reason why a case seemingly barred by the statute of limitations cannot be revived by a § 3292 application made before the Government has received all of the requested foreign evidence"), *cert.*

*denied Hoffecker v. United States*, 129 S. Ct. 652 (2008). Nevertheless, *Bischel* remains binding in this circuit.[2]

**[8]** Because the March 16 MLAT request was submitted before the statutes of limitations had run on any counts, the government's June 20 application revived any statutes of limitations that had expired in the period between the MLAT request and the application to suspend. The district court thus did not err in suspending the statute of limitations, effective March 16, 2005, for all counts.

C.   *Final Action Under § 3292.*

**[9]** Section 3292(b) provides that, subject to the outer limits provided in subsection (c), the period of suspension shall end on the date on which the foreign authority from whom evidence is requested "takes final action on the request." Final action is a dispositive response to each item set out in the official request, including a request for certification. *United States v. Hagege,* 437 F.3d 943, 955-56 (9th Cir. 2006); *United States v. DeGeorge*, 380 F.3d at 1215.

---

[2]Appellants argue *Stogner v. California*, 539 U.S. 607 (2003) overruled *Bischel*. In *Stogner*, the Court held that "a law enacted after expiration of a previously applicable limitations period violates the *Ex Post Facto* Clause when it is applied to revive a previously time-barred prosecution." *Id.* at 632-33. *Stogner* likely overruled the portions of *Bischel* concluding that enactment of a law extending the statute of limitations does not violate the *Ex Post Facto* clause when applied to crimes committed before the law was enacted. *See Bischel*, 651 F.3d at 1435-36. However, *Stogner*'s holding does not affect the portions of *Bischel* relevant to this case. *See Marks v. United States,* 430 U.S. 188, 191 (1977) ("The Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.") (citation omitted); *Bischel*, 651 F.3d at 1434 ("Here, however, it isn't a new statute that is the culprit, but its judicial application."). Because 18 U.S.C. § 3292 was enacted in 1984 — long before appellants committed their crimes — *Bischel* remains good law as applied to this case. *See* Act of Oct. 12, 1984, Pub. L. No. 98-473, § 1218(a), 98 Stat. 1837.

Appellants argue that Canada took "final action" on the request on or before July 5, 2005. If that is true, the suspension period would have lasted 111 days and accordingly, the statutes of limitations on six counts would have run by January 15, 2006, months prior to indictment. The government however contends that final action did not occur until April 12, 2006. If the government is correct, the suspension period was 492 days, and all counts of the indictment were timely. We agree with the government.

The March 16, 2005 MLAT letter requested certified copies of all records created or obtained by Thomson Kernaghan and Union Securities between September 1, 1999 and July 1, 2000, relating to "any and all accounts held or controlled" by Gentry, Jenkins and several aliases and nominee corporations.

Canada first responded in a letter dated June 27, 2005, informing the government that Thomson Kernaghan's bankruptcy trustee had located accounts for the listed corporations but was unable to locate accounts for Gentry, Jenkins or any of their aliases. The letter then instructed the United States to submit a supplemental request for the corporate records, without reference to accounts held or controlled by Gentry or Jenkins. It closed: "Please advise how you wish us to proceed."

On July 5, 2005, the Canadian government sent another response, this time informing the United States that it had located copies of the Union Securities accounts for Universal Dynamics, but had not located accounts for Gentry, Jenkins, their aliases, and one nominee corporation. The response included authenticated copies of the located Union Securities records.

On September 1, 2005, in response to the June 27, 2005 letter, the government sent a supplemental request for assistance, specifying its desire to obtain certified copies of the Thomson Kernaghan records associated with appellants' nominee corporations and omitting any mention of the individual

accounts. Canada responded to that request on April 12, 2006, when it provided certified copies of the Thomson Kernaghan account records for appellants' nominee corporations.

We find that the June 27 and July 5 responses were interim communications that did not constitute final action for the purposes of § 3292. The facts of this case are strikingly similar to those in *Hagege*, 437 F.3d at 955-56. In *Hagege*, the Israeli government responded to a request for certified records with uncertified records and a letter stating "in the future, should you need certified copies . . . please let me know." *Id.* at 956. This response, *Hagege* held, did not constitute a final action because the Israeli government had not provided a certificate of authenticity, nor had it indicated it would not comply with the request for certification. *Id.*

Similarly, the July 5 response was not a final action because it did not provide a dispositive response on every item requested — it only provided the certified records from Union Securities, not Thomson Kernaghan. The June 27 letter did not provide the requested records for corporations associated with Gentry and Jenkins; it also did not indicate that the Canadian government would not provide those records. Rather, the June 27, 2005 response specified further steps needed to acquire the certified records sought from Thomson Kernaghan. The government took those steps, and final action in this case occurred on April 12, 2006, when Canada provided certified copies of the corporate records at Thomson Kernaghan. Until that date, the United States did not have a dispositive response on every item initially requested.

**[10]** In sum, we hold that the government's June 20, 2005 application was sufficient to suspend the statute of limitations for all counts, effective March 16, 2005. The suspension period lasted until Canada took final action on April 12, 2006; no counts of the indictment were time barred.

## II. There Was Sufficient Evidence To Support Each Conviction.

Jenkins and Gentry allege insufficient evidence to support conviction on eight counts of securities fraud, six counts of wire fraud, twenty-four counts of money laundering, and one count of tax evasion. A court reviewing for sufficiency of the evidence must first "view[ ] the evidence in the light most favorable to the prosecution" and then determine whether "this evidence, so viewed, is adequate to allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils,* 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (alteration and citation omitted).

When "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson v. Virginia,* 443 U.S. 307, 326 (1979). Reversal is warranted when the evidence so construed "may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt" or is "insufficient to establish every element of the crime." *Nevils*, 598 F.3d at 1167. Applying these standards to the facts of this case, we conclude there was sufficient evidence to support conviction on all counts.

### A. *Materiality in Securities Fraud*

**[11]** Appellants argue there was insufficient evidence that the statements at issue in the securities fraud counts were material. Under 15 U.S.C. § 78j(b), any person who uses or employs a manipulative or deceptive device in connection with the sale of any security commits securities fraud. SEC Rule 10b-5, implementing the statute, forbids the making of "any untrue statement of a material fact." 17 C.F.R.

§ 240.10b-5(b). Materiality is an element of securities fraud. *In re Cutera Secs. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) ("Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material.")

For purposes of securities fraud, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). A statement is material if "a reasonable investor would have considered it useful or significant." *United States v. Smith*, 155 F.3d 1051, 1064 (9th Cir. 1998). The standard of materiality is an objective one. *United States v. Reyes*, 577 F.3d 1069, 1076 (9th Cir. 2009).

Appellants first contend that the government failed to prove that their misrepresentations had any effect on UniDyn's stock prices or the behavior of independent investors. They argue instead that UniDyn's stock rose due to external market forces, namely, the dot-com bubble. This argument fails. Materiality in securities fraud does not depend on demonstration of a market reaction to the misstatements. *No. 84 Empl'r-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 934-35 (9th Cir. 2003). Nor is the reliance of individual investors required to find a 10b-5 violation by misrepresentation. *See S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).[3]

**[12]** The evidence at trial proved that appellants made false

---

[3]Appellants also argue that because the government failed to conclusively prove that any investors were influenced by false press releases to purchase UniDyn stock, the press releases were not material for wire fraud purposes. Materiality is an element of wire fraud. *See Neder v. United States*, 527 U.S. 1, 20 (1999). But a statement is material for wire fraud purposes only if it has the "natural tendency to influence or be capable of influencing [the person to whom] it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (internal quotation marks omitted). There is no requirement that the statements actually influence those to whom they are addressed.

statements about the viability of UniDyn's products, its trans-actions and business dealings, and the identity of its share-holders. "[I]nformation regarding a company's financial condition is material to investment." *Reyes*, 577 F.3d at 1076; *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) (statements failing to disclose concerns regarding the safety of a product were material). A reasonable investor would have wanted to know that UniDyn's allegedly lucrative transactions were shams, that Gentry and Jenkins controlled millions of shares of UniDyn stock, and that Sterling's release was not imminent. We conclude that the SEC filings were false and material.

Jenkins contends that Raging Bull message board posts giv-ing rise to two counts of securities fraud were not material because "vague" posts on an internet message board would not be important to a reasonable investor. Jenkins's posts to Raging Bull clearly concerned material information. *See Basic Inc.*, 485 U.S. at 240; *Reyes* 577 F.3d at 1075. We are not persuaded by Jenkins's argument that posts on an internet message board, regardless of their content, can never be important to a reasonable investor. At trial, the government introduced evidence that Gentry closely monitored posts on Raging Bull and instructed employees to post positive com-ments and counteract negative ones. It also introduced evi-dence that one of UniDyn's board members and shareholders read Raging Bull to keep apprised of information about the company. This was sufficient to allow the jury to conclude that the Raging Bull posts were material. *Cf. United States v. Phillip Morris USA, Inc.*, 566 F.3d 1095, 1122-23 (D.C. Cir. 2009) (holding that tobacco company's continuous denials of the link between cancer and smoking indicates that such information was material, regardless of the fact that denials were contrary to all available scientific evidence).

B. *Variance Between Indictment and Evidence on Count Seventeen.*

[13] Gentry argues that the evidence was insufficient to support his conviction on count seventeen (securities fraud)

because the indictment referred to false and misleading statements made on Form *10-Q* filed with the SEC on April 2, 2001, but the evidence introduced at trial related to a fraudulent form *10-K* filed on the same date. Because Gentry did not raise this argument below, we review for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993). To prevail, appellants "must show (1) that there was error, (2) that the error was plain and (3) that the error affected [ ] substantial rights." *United States v. Alghazouli*, 517 F.3d 1179, 1188 (9th Cir. 2008), *cert. denied Alghazouli v. United States*, 129 S. Ct. 237 (2008). Even if appellants make all three of these showings, we should reverse "only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1188.

**[14]** The primary difference between a form 10-K and a form 10-Q is the time it is filed: a 10-K is filed yearly and a 10-Q is filed quarterly. However, both the 10-K and the 10-Q require the company to disclose information about its financial condition, operations, and the owners of its securities. *Compare* U.S. SEC, Form 10-Q, http://www.sec.gov/about/forms/form10-q.pdf, *with* U.S. SEC, Form 10-K, http://www.sec.gov/about/forms/form10-k.pdf. The evidence at trial showed the form 10-K was fraudulent for the reasons alleged in the indictment — it failed to disclose Gentry's ownership of millions of shares of UniDyn Stock and falsely represented that UniDyn had patents pending for Sterling. Furthermore, the type of form is not an element of the offense. *See* 15 U.S.C. § 78ff (making it a crime to make or cause to be made a false or misleading statement in any application, report or document required to be filed pursuant to the chapter or regulations); 17 C.F.R. § 240.10b-5(b) (applying to any untrue statement of material fact). Even though the indictment was erroneous, the error did not relieve the government of proving every element of the offense, and did not prejudice Gentry.[4] *See Nevils*, 598 F.3d at 1167.

---

[4]For similar reasons, we reject Gentry's argument that the evidence at trial constructively amended count seventeen, warranting reversal.

C.  *Specific Intent To Commit Wire Fraud.*

**[15]** Wire fraud has three elements: (1) a scheme to defraud; (2) use of wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud. *United States v. Green*, 592 F.3d 1057, 1064 (9th Cir. 2010). Jenkins contends that the government failed to prove an element of wire fraud because it did not demonstrate that his February 13, 2001 post on Raging Bull was made with the specific intent to participate in a scheme to defraud. We disagree.

**[16]** Specific intent can be established by circumstantial evidence. *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 1993) (holding that misrepresentations and omissions are sufficient from which to infer intent to defraud). The scheme itself may be probative circumstantial evidence of the intent to defraud. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). Jurors considered evidence that Jenkins helped create all of the offshore corporations holding UniDyn stock, helped to sell the stock, and helped to move the various proceeds to accounts controlled by appellants, and, further, that his posts on Raging Bull were false and misleading. The jury convicted Jenkins of conspiracy to (1) commit securities and wire fraud and (2) defraud the United States government. From this evidence, a reasonable juror could infer that Jenkins intended to defraud investors.

D.  *Tax Evasion*

On appeal, Gentry argues for the first time that the there was insufficient evidence to support his conviction for tax

---

Although an indictment, once returned by the grand jury, may not thereafter be broadened, except by the grand jury, minor differences between indictment and the proof at trial can be dismissed as a mere variance. *United States v. Hartz*, 458 F.3d 1011, 1019-20 (9th Cir. 2006). If the variance does not alter the behavior for which defendant was charged, the conviction may stand. *Id*. at 1021. Because the type of form filed is not a necessary element of securities fraud, any variance from the charging document did not alter the behavior for which Gentry was convicted. There was no prejudice to Gentry.

evasion under 26 U.S.C. § 7201. Because Gentry did not preserve this issue at the close of trial, we review for plain error. *Olano*, 507 U.S. at 732.

**[17]** The existence of a tax deficiency is an element of tax evasion under 26 U.S.C. § 7201. *Boulware v. United States*, 552 U.S. 421, 424 (2008). Gentry argues that Agent Kathleen Cornelius (the IRS agent who calculated the gain Gentry realized from UniDyn stock sales) gave little explanation of how she calculated the deficiency and did not consider Gentry's testimony about his basis in the shares, which would have offset any gains realized by the sales. The record does not compel a conclusion that Agent Cornelius' calculation was incorrect.

### E. *Financial Transactions and Concealment Money Laundering*

Appellants were convicted of "concealment money laundering" under 18 U.S.C. § 1956(a)(1)(B)(i), which makes it a crime for a person to conduct a financial transaction that involves use of the proceeds of a specified unlawful activity, "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . ." A "financial transaction" under 18 U.S.C. § 1956(c)(4) must itself affect interstate or foreign commerce in a way, or use a financial institution that is engaged in or affects interstate or foreign commerce. Jenkins argues that there was insufficient evidence from which a reasonable juror could find that the conduct charged in six counts qualified as "affecting interstate or foreign commerce."

**[18]** The six counts involved transfer of funds by wire and writing checks to fund investments and to purchase vehicles. These acts affect interstate commerce and certainly are financial transactions. *See* 18 U.S.C. § 1956(c)(4)(i) (transfer of funds by wire is a financial transaction); 18 U.S.C.

§ 1956(c)(4)(ii), (c)(5) (use of monetary instruments, including checks, is a financial transaction); 18 U.S.C. § 1956(c)(4)(iii) (transactions involving transfer of title to a vehicle is a financial transaction); *United States v. Evans*, 272 F.3d 1069, 1080 (8th Cir. 2001) (holding that the purchase of an automobile from a commercial dealer unquestionably has an effect on interstate commerce). There was sufficient evidence from which a juror could find that Jenkins engaged in financial transactions to support conviction on the money laundering counts.

### F.  *International Concealment Money Laundering*

Appellants were also convicted of several counts of international concealment money laundering under 18 U.S.C. § 1956(a)(2)(B)(i), which applies to transfers of funds into the United States from a foreign country, or vice-versa. Gentry contends that there was insufficient evidence that the funds in counts thirty-five to forty-five actually traveled into or out of the United States. Gentry argues that while Thomson Kernaghan was a Canadian brokerage firm, and Global Bank of Commerce Swiss American Bank Limited was in Antigua, the debiting banks for the transfers at issue were located in New York City. Thus, he concludes, the funds themselves never crossed United States borders, even if the orders to transfer them came from originating banks abroad.

[19] The only witnesses to testify about the process of international wire transfers were Agent Cornelius and Gentry. Agent Cornelius testified that the funds originated wherever the "originator" bank was located. During her testimony, the government introduced into evidence two summary exhibits, pursuant to Federal Rule of Evidence 1006,[5] illustrating the

---

[5]Federal Rule of Evidence 1006 permits the contents of voluminous writings which cannot conveniently be examined in court to be presented in the form of a chart, summary, or calculation, provided the original writings are available to the parties. In this case, the charts summarized bank records and checks introduced into evidence.

flow of funds from Canada to the United States, and from the United States to Antigua. Though Gentry disputed the accuracy of the summary charts and Agent Cornelius's testimony, where the evidence supports either of two constructions, we must assume that the jury resolved this dispute in favor of the government and defer to that resolution. *Jackson*, 443 U.S. at 326.

### G. *Profits v. Proceeds in Money Laundering*

As a final basis to challenge their money laundering convictions, appellants argue that the government failed to prove that the funds at issue were the "profits" of specified unlawful activity, rather than the "proceeds" (meaning gross receipts) of that activity.[6] To establish the "profits" of a specified unlawful activity, the prosecution "needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction." *United States v. Santos*, 553 U.S. 507, 520 (2008) (Scalia, J., joined by Souter, Thomas, & Ginsburg, J.J., a plurality joined by Stevens, J.). The factfinder need not consider the "profitability of some entire criminal enterprise." *Id.* "What counts is whether the receipts from the . . . unlawful act exceeded the costs fairly attributable to it." *Id.* The government met its burden here.

**[20]** The evidence at trial established that all of the funds involved in the money laundering transactions were derived from the sale of UniDyn stock held in accounts at Thomson Kernaghan and Union Securities. A reasonable juror could

---

[6]In *United States v. Santos*, 553 U.S. 507, 509, 523 (2008), a plurality of the Court held that the rule of lenity demanded that the term "proceeds" in 18 U.S.C. § 1956(a)(1) be construed to mean profits rather than receipts. After *Santos*, Congress amended the money laundering statute to define proceeds to include the gross receipts of unlawful activity. 18 U.S.C. § 1956 (c)(9). The amendment became effective May 20, 2009. Because defendants were indicted on May 3, 2006, *Santos* governs this case.

have concluded that those funds were the receipts of appellants' securities fraud and wire fraud.[7] There was also sufficient evidence to support the jury's conclusion that those receipts exceeded the costs fairly attributable to securities fraud and wire fraud. Agent Cornelius testified that, for each account from which funds were laundered, she calculated the "net proceeds" in the account, meaning the total amount realized from the sales of stock less any commissions paid. No evidence indicated that any funds in the Canadian accounts were used to defray the costs of appellants' securities fraud and wire fraud (for example, by paying for the costs of wiring false press releases). The evidence was sufficient to allow a reasonable juror to conclude that the funds laundered were the profits of securities fraud and wire fraud.

## III. The Money Laundering Instructions Did Not Prejudice Appellants.

[21] Defendants next contend that the money laundering instructions were reversible error. In order to convict defendants of international concealment money laundering, the statute requires the government to prove that defendants' movement of funds out of or into the United States was designed to conceal the nature, location, source, or ownership or control of the profits of *specified unlawful activity*. 18 U.S.C. § 1956(a)(2)(B)(i) (emphasis added). Similarly, in order to prove that defendants concealed money as part of a

---

[7]Gentry argues that the money laundered could not be the profits of unlawful activity, because his securities and wire fraud convictions were based on acts committed on or after April 17, 2001 and the bulk of the money laundering transactions occurred on or before April 12, 2001. However, the Government introduced extensive evidence of misrepresentations in Raging Bull posts, press releases and SEC filings that occurred between 1997 and April 2001. Those misrepresentations concerned the very subjects underlying Gentry's securities fraud convictions: the viability of Sterling, the profits of UniDyn, and the identity of its investors. This was sufficient to allow the jury to conclude the funds were the receipts of prior, uncharged securities fraud.

money laundering scheme, the government had to prove that defendants knowingly used the proceeds of a specified unlawful activity in a financial transaction, knowing that the transaction was intended to conceal the nature, location, source, ownership, or control of the proceeds of *specified unlawful activity*. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). The statutory definition of specified unlawful activity includes securities fraud and wire fraud. *See* 18 U.S.C. § 1956(c)(7)(A) (incorporating offenses listed in 18 U.S.C. § 1961(1)).

In this case, rather than use the term "specified unlawful activity," the jury instructions used the term "prior criminal activity." Appellants argue the instructions permitted the jury to convict them of laundering money that was not the proceeds of securities fraud or wire fraud. Because appellants did not object to the jury instructions at trial, we review for plain error. *Alghazouli*, 517 F.3d at 1188.

**[22]** "It is well-established that a trial court errs if it fails to instruct the jury on an element of a charged offense." *Id.* at 1189 (citing *United States v. Gaudin*, 515 U.S. 506, 509-11 (1995)). However, we hold that the error did not affect appellants' substantial rights. For an error to affect substantial rights, "in most cases it means that the error must have been prejudicial." *Alghazouli*, 517 F.3d at 1190. When determining prejudice, the court does not examine the jury instructions in isolation. *Id*. It may take into account the evidence presented at trial. *See United States v. Nguyen*, 565 F.3d 668, 677-78 (9th Cir. 2009) (concluding that plainly erroneous jury instructions did not affect substantial rights where there was significant, uncontested evidence of the missing element presented at trial).

**[23]** Taking into account the other crimes charged and the evidence introduced at trial, we cannot conclude that, had the money laundering instructions included the term "securities fraud and wire fraud" instead of "prior criminal activity," there is a reasonable probability the jury's verdict would have

been different. Four facts support our conclusion. First, the jury instructions, while erroneous, clearly required the jury to find that the money was derived from prior *criminal* activity. *Cf. Alghazouli*, 517 F.3d at 1191 (stressing that the danger of an instruction for conspiracy to commit money laundering that failed to mention the element that the funds be derived from specified unlawful activity is that the jury might be persuaded to convict even though the laundered money was derived from legal activity). Second, appellants do not argue that the funds at issue were derived from anything other than the sale of UniDyn stock. Third, the jury convicted Jenkins and Gentry of multiple counts of securities and wire fraud, so it was well aware of the nature of the illegal activity from which the money was derived. *See id.* at 1191-92. Finally, the only other crimes charged were tax evasion (for failing to report income derived from the sales of UniDyn stock) and conspiracy to commit securities fraud and wire fraud. Thus, it is virtually impossible that the jury convicted appellants of money laundering on a finding that the funds involved anything other than the proceeds of securities fraud and wire fraud.

## IV.  Gentry Fails to Prove that the Trial Court Erroneously Denied His Additional Motions

Gentry argues that the district court erroneously denied two motions made during trial. First, he argues the district court erroneously denied his motion to sever his trial from Jenkins's, because Jenkins's trial strategy was to downplay his culpability in comparison to Gentry's. A district court's denial of a motion to sever is reviewed for abuse of discretion. *United States v. Decoud,* 456 F.3d 996, 1008 (9th Cir. 2006). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *Id.* (internal quotation marks and citation omitted).

**[24]** Gentry has not met this burden. The possibility of acquittal in a separate trial is not itself sufficient to require severance. *Id.* In addition, because appellants were charged with conspiracy, a joint trial was particularly appropriate. *Zafiro v. United States*, 506 U.S. 534, 536-37 (1993).

Gentry also argues that the district court violated his constitutional right to confrontation when it denied his motion to conduct additional cross-examination of Hiroshi Tsuriya, whom Gentry claimed signed a $200 million contract to purchase Sterling. "[A] limitation on cross examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant." *United States v. Rodriguez-Rodriguez*, 393 F.3d 849, 856 (9th Cir. 2005).

**[25]** Gentry has not demonstrated that the district court limited relevant testimony. Tsuriya testified during a video deposition that he never signed a contract and that the signature on the alleged nineteen-page contract was not his. On cross examination, Tsuriya admitted that in 1999, he had (at Gentry's request) signed a single-page document without reading it and faxed it to Gentry. Tsuriya testified that he had not seen the document since. Gentry has not demonstrated how the document Tsuriya admits to signing (which Gentry admits is "innocuous") was relevant or how his inability to conduct additional cross-examination in respect to it prejudiced his defense.

## V. The District Court Did Not Err at Sentencing

Appellants first argue that the district court committed procedural error at sentencing by miscalculating the amount of loss and number of victims. We review a sentencing court's application of the Guidelines to the case, including its calculation of the Guidelines range, for abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc), *cert. denied Zavala v. United States*, 553 U.S. 1061 (2008). A district court's findings of fact at sentencing must be sup-

ported by a preponderance of the evidence, unless the sentencing factor has an "extremely disproportionate effect on the sentence relative to the offense of conviction," in which case findings of fact must be supported by clear and convincing evidence. *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005). We hold that the district court did not err, either procedurally or substantively, at sentencing.

### A.  *Amount of Loss*

Loss calculation is highly individualized and fact specific; the same method is not necessarily appropriate in all cases. *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The Sentencing Guidelines offer several possible approaches to loss calculation. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(A) (2009). Typically, loss is the greater of actual loss ("the reasonably foreseeable pecuniary harm that resulted from the offense") or intended loss ("the pecuniary harm that was intended to result"). *Zolp*, 479 F.3d at 718-19. The sentencing court uses the gain that resulted from the offense as an alternative measure of loss "only if there is a loss but it reasonably cannot be determined." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. 3(B)(2009).

In this case, because the loss amount increased the base offense level by twenty, the district court required the Government to provide "clear and convincing" evidence of the loss amount.[8] At sentencing, the district court considered two options: a loss amount of $26 million (calculated by multiplying the average price of UniDyn stock during the conspiracy less the residual value of the stock after the scheme ended by

---

[8]The district court was overly cautious in adopting the clear and convincing standard. Sentencing enhancements based entirely on the nature and extent of the conspiracy, as opposed to acquitted or uncharged conduct, typically do not require proof by the clear and convincing standard. *United States v. Armstead,* 552 F.3d 769, 777 (9th Cir. 2008); *United States v. Harrison-Philpot,* 978 F.2d 1520, 1524 (9th Cir. 1992).

the number of outstanding shares), and a loss amount of $9 million (based on the court's measure of appellants' ill-gotten gains subject to forfeiture). The district court believed that the evidence of ill-gotten gains was "so clear and convincing" that it chose to adopt that measure of loss over the "more controversial and disputable" amount based on stock prices.

[26] The sentencing guidelines clearly permitted the district court to adopt this method of calculating loss. Further, the district court's factual finding that appellants realized approximately $9 million of ill-gotten gains was made after a hearing during which the court heard arguments by both parties, considered all of the evidence introduced at trial, and reviewed evidence not introduced at trial. This factual finding was not clearly erroneous. The district court did not err in calculating the amount of loss.

B. *Number of Victims*

[27] Appellants challenge the court's determination that there were more than fifty victims of their schemes, arguing that there was no evidence of any loss to individuals resulting from their conduct. We disagree. The district court correctly required proof by a preponderance of the evidence that there were more than fifty victims. *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009). The sentencing judge reviewed approximately sixty victim impact statements, SEC filings submitted into evidence stating that there were approximately 2500 shareholders of UniDyn stock, and evidence at trial demonstrating that 17 million shares of UniDyn stock were held in street names. The court's factual finding of more than fifty victims was not clearly erroneous. There was no error in sentencing.[9]

_____

[9]We reject Gentry's argument that the district court erred when it made a two-level upward adjustment for abuse of public trust under U.S. Sentencing Guidelines Manual section 3B1.3 and a three-level upward adjustment for his role as manager under section 3B1.1. The Sentencing Guidelines specifically provide that an enhancement "based upon an abuse of a position of trust . . . may be employed in addition to an adjustment under § 3B1.1. . . ." U.S. Sentencing Guidelines Manual § 3B1.3.

## C.   *Substantive Unreasonableness*

Finally, Jenkins contends that his sentence is substantively unreasonable. Jenkins was sentenced to ninety months in prison, a term half as long as Gentry's and significantly below the Guidelines range of 324 to 405 months. In determining substantive reasonableness, we must consider the "totality of the circumstances," including the degree of variance for a sentence imposed outside of the Guidelines range, giving "due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Carty*, 520 F.3d at 993 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

[28] In this case, the district court considered that Jenkins used his expertise and legal training to create a web of fictitious offshore companies to perpetrate fraud, that he had been involved in illegal schemes to avoid taxes for twenty years and that he refused to acknowledge those schemes' illegality. However, the court considered "most significantly" that Jenkins was "less culpable" than Gentry and did not receive large profits from the fraud. Giving due deference to the sentencing judge, Jenkins's ninety-month sentence was substantively reasonable.

## CONCLUSION

We AFFIRM appellants' convictions and sentences.