NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

DEC 10 2018

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16-10452 |
| Plaintiff-Appellee, | D.C. No. 1:15-cr-00017-ARM-1 |
| v. | |
| JORDAN M. JUCUTAN, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Alex R. Munson, District Judge, Presiding

Argued and Submitted October 11, 2018
Honolulu, Hawaii

Before: WARDLAW, BERZON, and BENNETT, Circuit Judges.

Jordan M. Jucutan appeals the district court's denials of his motion to

dismiss the indictment. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 1294

and 48 U.S.C. §§ 1821, 1824. We review the district court's denials of Jucutan's

motion to dismiss for plain error because Jucutan did not previously raise his

current arguments below. *See United States v. Yijun Zhou*, 838 F.3d 1007, 1010

---

\* This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

(9th Cir. 2016); *see also* Fed. R. Crim. P. 52(b). We review any factual findings underlying the denials for clear error. *See United States v. Jenkins*, 633 F.3d 788, 797 (9th Cir. 2011). We affirm the district court's denials of Jucutan's motion to dismiss the indictment.

The district court correctly concluded that the criminal indictment against Jucutan was not barred by the generally applicable five-year statute of limitations period provided in 18 U.S.C. § 3282(a). The court did not plainly err by concluding that the Wartime Suspension of Limitations Act (WSLA), 18 U.S.C. § 3287, applied to toll the five-year limitations period. The government demonstrated that the offenses charged were "committed in connection with the . . . performance . . . of any contract, subcontract, or purchase order which is . . . directly connected with or related to the authorized use of the Armed Forces," satisfying the third prong of the WSLA's offense clause. 18 U.S.C. § 3287. The district court correctly found that Document and Packaging Broker, Inc. (Docupak) contracted with the Army Reserve to administer its recruiting assistance program, AR-RAP. The Army Reserve used task orders to request funding for AR-RAP from the National Guard's "umbrella contract" with Docupak. Docupak invoiced the Army Reserve for reimbursement pursuant to those task orders.

The government also sufficiently demonstrated that AR-RAP was "directly connected with or related to" the United States' use of the Armed Forces pursuant

2

to either the Authorization for Use of Military Force Against Iraq Resolution of 2002 (AUMFAI) or the Authorization for Use of Military Force (AUMF). The AUMFAI authorized the President to "defend the national security of the United States against the continuing threat posed by Iraq," including "Iraq's ongoing support for international terrorist groups." AUMFAI, Pub. L. No. 107-243, preamble, §§ 3(a), 3(b), 116 Stat. 1498. The AUMF authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, . . . in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." AUMF, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001).

The Army Reserve implemented AR-RAP to "transition[] from a stand-by reserve to an operational reserve," in light of remaining "challenges for the Global War on Terror (GWOT) and for manning the [Army Reserve]." Through AR-RAP, the Army Reserve hired more personnel to meet their "end-strength" goals as the global war on terror drew reservists into active operations. Thus, the district court correctly concluded that AR-RAP had a direct connection with or

relationship to the use of the Armed Forces pursuant to the AUMF or the AUMFAI to combat international terrorism.[1]

**AFFIRMED.**

---

[1] The district court had both authorizations before him, but did not specify on which "authorized use of the U.S. military in wartime" he relied in denying Jucutan's motion to dismiss the indictment. In any event, Jucutan waived any objection to the district court's reliance on either the AUMF or the AUMFAI by failing to raise such arguments before the district court. *See Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so.").

*United States v. Jucutan*, No. 16-10452

BERZON, Circuit Judge, dissenting:

I respectfully dissent.  In my view, the district court plainly erred in concluding that the Wartime Suspension of Limitations Act ("the Act") applies to the wire fraud and aggravated identity theft charged against Jordan Jucutan.

As relevant to this case, the Act applies only to criminal offenses "committed in connection with the . . . performance . . . of any contract . . . which is . . . directly connected with or related to [a congressionally] authorized use of the Armed Forces"; it does not apply to "military actions not specifically authorized by Congress pursuant to the War Powers Resolution."  S. Rep. No. 110-431, at 4 (2008).  The Supreme Court has repeatedly counseled that the Act "should be 'narrowly construed' and 'interpreted in favor of repose.'"  *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1978 (2015) (quoting *Bridges v. United States*, 346 U.S. 209, 216 (1953)).

I disagree with the majority's conclusion that the government has provided evidence showing that the Army Reserve – Recruiting Assistance Program ("AR-RAP") was "directly connected with or related to" either the Authorization for Use of Military Force Against Iraq Resolution of 2002 ("AUMFAI") or the Authorization for Use of Military Force ("AUMF") passed in response to the September 11 attacks.

1

The majority implies that the AUMF and the AUMFAI broadly authorize the use of the Armed Forces to "combat international terrorism." Neither authorization is so capacious.

The AUMFAI, passed on October 16, 2002, authorized the President to:

> use the Armed Forces of the United States as he determines to be necessary and appropriate in order to—
>
>> (1) defend the national security of the United States against the continuing threat posed by Iraq; and
>>
>> (2) enforce all relevant United Nations Security Council resolutions regarding Iraq.

Pub. L. No. 107-243, 116 Stat. 1501.[1] The AUMF, passed on September 18, 2001, authorized the President to:

> to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107-40, 115 Stat. 224. To reiterate, the AUMF twice states that the authorization is limited to "those nations, organizations, or persons [the President]

---

[1] The majority quotes language from the AUMFAI noting "Iraq's ongoing support for international terrorist groups." This language appears in the preamble to the joint authorization, as part a sentence explaining why "it is in the national security interests of the United States and in furtherance of the war on terrorism that all relevant United Nations Security Council resolutions be enforced." Pub. L. No. 107-243, 116 Stat. 1500. But the preamble is not the operative language of the document, which authorized only the use of force directed at "the threat posed by Iraq" and "regarding Iraq."

2

determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." *Id.*

The government relies on a work statement for AR-RAP to show that program is directly connected with or related to the AUMF or the AUMFAI. That work statement states that:

> as the Army Reserve (AR) transitions from a stand-by reserve to an operational reserve there still remains challenges for the Global War on Terror (GWOT) and for manning the AR. The current strength of the Selected Reserve (SELRES) is just under 195K; missing end-strength goal by 10K.

But this language cannot expand narrow authorizations contained in the AUMFAI and the AUMF.[2] The government has made no effort to show that the need to recruit 10,000 more Army Reserve troops was "directly connected with or related to" the ongoing conflict in Iraq, or efforts targeting the nations, persons, and organizations that orchestrated the September 11 attacks, as opposed to other potential missions related to the Global War on Terror.

---

[2] I note that both authorizations also state that the President has independent "authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." Pub. L. No. 107-40, 115 Stat. 224; Pub. L. No. 107-243, 116 Stat. 1501. The executive exercise of such authority may constitute part of the Global War on Terror, but only congressionally authorized uses of force trigger the Act's suspension of limitations periods.

I would therefore hold that the government has not met its burden of showing that the Act applies, and that the statute of limitations had run before this prosecution began.